## HALL v. FRENCH AMERICAN WINE CO.

(Supreme Court, Appellate Division, First Department. March 15, 1912.)

1. FACTORS (§ 44*)—SALES (§ 1*)—COMPENSATION—COMMISSIONS—"SALE"— "ORDER."

   A sale of personal property is a transmutation of property from one man to another in consideration of some price or recompense in value, and so one having an agency to sell wine, which he was expected to deliver, is not entitled to a commission on the mere procuring of orders, the title of the wine not passing until an actual delivery; an "order" being only an executory agreement which cannot even be deemed a "sale" for the purpose of determining the number of sales made by the agent in a given time.

   [Ed. Note.—For other cases, see Factors, Cent. Dig. §§ 58, 59; Dec. Dig. § 44;* Sales, Cent. Dig. §§ 1, 3–5; Dec. Dig. § 1.*

   For other definitions, see Words and Phrases, vol. 6, pp. 5017–5023; vol. 8, p. 7739; vol. 7, pp. 6291–6306; vol. 8, p. 7793.]

2. CONTRACTS (§ 170*)—CONSTRUCTION—RULES.

   The practical construction given a contract by the parties themselves is always of great importance in determining its meaning.

   [Ed. Note.—For other cases, see Contracts, Cent. Dig. § 753; Dec. Dig. § 170.*]

3. FACTORS (§ 1*)—BROKERS (§ 2*)—WHAT CONSTITUTES.

   One having the exclusive agency for the sale of wine in a certain territory, and who is required to deliver it and account to his principal, is not a broker, but is a factor, and so is not entitled to compensation upon the mere procuring of orders.

   [Ed. Note.—For other cases, see Factors, Cent. Dig. § 1; Dec. Dig. § 1;* Brokers, Cent. Dig. § 1; Dec. Dig. § 2.*]

Appeal from Trial Term, New York County.

Action by Herbert I. Hall against the French American Wine Company. From a judgment for plaintiff and an order denying its motion for new trial, defendant appeals. Reversed and remanded.

Argued before CLARKE, McLAUGHLIN, SCOTT, MILLER, and DOWLING, JJ.

Warren Bigelow, for appellant.
Frederic R. Kellogg, for respondent.

MILLER, J. On the 25th of August, 1908, the plaintiff and the defendant entered into a written contract, whereby the latter employed the former as its sole agent for the sale of wines and brandies, at prices and upon terms and conditions to be fixed by it, in the states of Maine, New Hampshire, Vermont, Massachusetts, Rhode Island, Connecticut, New York, Pennsylvania, New Jersey, and the District of

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Columbia. ' The plaintiff was to receive $1 a barrel on all sales made either by him or by the defendant directly within that territory, and he agreed to push the sale of the defendant's products in every way possible, to extend its business and protect its interests to his utmost ability, to make prompt remittances, and to account for all money and property in his hands belonging to it. He was to give a bond in the sum of $5,000 for the faithful performance of his duties, and it was agreed that the contract should remain in force for one year, and that:

"If in that time the sales in the above states shall aggregate four thousand barrels (4,000) from the date hereof, it is to be continued for four (4) years in addition, or until August 25, 1913."

On the 25th of August, 1909, the defendant discharged the plaintiff, and this action is to recover damages therefor. One of the questions in dispute was whether the sales in plaintiff's territory amounted to 4,000 barrels. It was admitted that 3,436 barrels were actually delivered on orders taken by the plaintiff, and that the defendant sold directly within that territory 182 barrels, making a total of 3,818 barrels. The plaintiff asserted that he was entitled to credit for a number of unfilled orders, any one of which was sufficient to supply the shortage, viz., an order for 480 barrels procured from one Lupo, upon which 250 barrels remained undelivered; an order for 400 barrels procured from one Valenza, upon which 234 barrels were undelivered; an unfilled order obtained from one Conte for 180 barrels, to be computed with any one of a number of small unfilled orders; and an order for 500 barrels obtained from the Independent Wine Company. The Lupo order was not filled for the reason that Lupo failed and absconded. The Valenza order contained this provision:

"Delivery to be made at my option in lots of not less than 25 bbls. at a time, the total quantity to be taken within 6 months, but if there should be a balance at the expiration of 6 months, you will grant me an extension of time."

The defendant had previously directed the plaintiff to accept the Valenza order only in case the customer would agree to accept delivery of 40 to 50 barrels weekly. The Conte order was not included in the plaintiff's bill of particulars. It appears that the plaintiff had sold and delivered a quantity of wine to Conte, and, a dispute having arisen, had made him certain allowances and had written the defendant, saying that those allowances had been made for the purpose of getting an order from him for 180 barrels. No such order, however, was ever submitted by the plaintiff. The plaintiff testified that the Valenza and Conte orders were not filled because the wine in his possession turned sour; but there is no claim that he ever requested the defendant to furnish additional wine with which to fill those orders. It is unnecessary to consider separately the small orders, as it is not claimed that their aggregate amount is sufficient to make up the deficiency of 182 barrels. While the plaintiff claimed to have obtained an order for 500 barrels from the Independent Wine Company, no such order was ever submitted to the defendant and an officer of that company, though not the one with whom the plaintiff claimed to have made the arrangement testified that it was not in a position to give such an order and that it had not given one to his knowledge. The plaintiff

did not even inform the defendant who his customer was, but on August 24, 1909, wrote the defendant's representative, saying that he had received an order for 500 barrels of claret, deliveries to be made at a minimum rate of 100 barrels a month, the terms of sale to be, according to the plaintiff's testimony, "24½ cents per gallon f. o. b. cars California. Cash on arrival." The said representative testified that the letter, when delivered to him, read "f. o. b. dock New York." · He indorsed on the back of the letter a refusal to accept on the ground that the price was too low and returned it to the plaintiff. All of the foregoing alleged orders were submitted to the jury, with the instruction:

"If this man Hall, under this contract, sold wines, he performed his duty if he obtained, in good faith, orders for wines or brandies from purchasers within his territory, upon the terms authorized or accepted by the defendant; so that if he got these customers whose wines were undelivered, made a contract to sell wines to them within the terms which he was authorized by the defendant to make, if the terms of his sales to these parties were authorized or accepted by the defendant, he is entitled to his commissions upon those sales whether the goods were afterwards delivered or not."

The exception to that charge presents the question whether an order accepted by the defendant was a "sale" within the meaning of that contract.

[1] There can be no ·doubt that in law, and even in common acceptance, a sale of merchandise involves the transfer of title, and that an executory agreement to sell is not a sale. The word "sale" is thus defined by the text-writers:

"Sale, or exchange, is a transmutation of property from one man to another, in consideration of some price or recompense in value." Sharswood's Blackstone, vol. 1, p. 446. "By the common law a sale of personal property is usually termed 'a bargain and sale of goods.' It may be defined to be a transfer of the absolute or general property in a thing for a price in money." Benjamin on Sales (7th Ed.) p. 1. "A sale is a transfer of the absolute title to property for a certain agreed price." Story (W. W.) on Sales, p. 1. "A sale of personal property is the transfer, in pursuance of a valid agreement, from one party, called the seller, to another, called the buyer, of the general or absolute title to a specific chattel, for a price, or a consideration estimated, in money." Mechem on Sales, vol. 1, p. 3.

Kent says "of the contract of sale" that:

"A sale is a contract for the transfer of property from one person to another, for a valuable consideration. * * * The thing sold must have an actual or potential existence, and be specific or identified, and capable of delivery, otherwise it is not strictly a contract of sale, but a special or executory agreement."

According to Kent's definition, the orders in this case were special or executory agreements, not contracts of sale.

The plaintiff, however, contends that a broker to sell earns his commission when an enforceable contract is made, and that, as the plaintiff was merely employed as a broker, the word "sales" should be construed to include an executory contract. It is true that one employed merely as a go-between has performed his work and earned his commission, when he has produced a purchaser acceptable to his principal. The familiar cases mostly relating to sales of real estate need not be cited. I do not say that a different rule applies to an·

agency to sell real estate from that applicable to one to sell personal property. But there is a distinction between an executory contract of purchase and sale of real property and an accepted order for a quantity of unidentified personal property. In the former case, there is a transfer of the equitable title—hence a sale. In the latter case, there is no sale, but only an executory agreement.

The plaintiff was to have commission on his own sales, and on those directly made by the defendant within his territory his agency was exclusive, and all sales made were to be counted in making up the total number, which was to be the test of his efficiency. If the Lupo order had been sent to the defendant directly, without the plaintiff's intervention, it would certainly not be claimed that the 250 barrels undelivered were sold within the meaning of the contract so as to entitle the plaintiff to his commission and to the right to count them in making up the 4,000 barrels. And yet, if there was a sale in one case, there would be in the other. The contract makes no distinction between sales made by the plaintiff and those made by the defendant.

[2, 3] The plaintiff was not employed simply as a broker, a mere go-between. While the contract does not specify his duties, it plainly shows that the parties contemplated that he would do more than obtain orders. As a matter of fact, consignments were made directly to him, and from them he himself made deliveries to fill his orders, rendering accounts thereof to his employer. After the contract was terminated, he wrote to the defendant, saying:

"I shall retain under my factor's lien all property now in my possession belonging to the French American Wine Company."

He was in truth what he claimed to be, a factor. His work in a given case was not done when an order was obtained, because he still had to make delivery. Delivery then was essential to entitle him to a commission.

The practical construction given a contract by the parties themselves is always of great importance in determining their meaning. Throughout the entire year of the contract the plaintiff rendered statements in which he charged commissions only for wine actually delivered. The effect of his act, as a practical construction of the contract, is somewhat weakened by the fact that on the 26th of January, 1909, in a letter to the defendant he said:

" * * * It was understood by me that the brokerage was to be paid when the order was accepted as customary and usual."

And in a letter of January 6, 1909, he had said:

"It is the custom of the trade as well as the usual method of doing business in all lines that when the broker has effected a sale and the credits and terms are satisfactory to the seller, that he has completed his part of the transaction and has earned his brokerage."

Those statements, however, were made in reference to the claims of subagents employed by him, who were strictly brokers, mere go-betweens, to find customers, and while he made those statements he never in fact asserted a claim for commissions on unfilled orders until after his discharge. We think therefore that the word "sales," as used in

134 N.Y.S.—11

the contract, should be construed according to its ordinary and legal acceptance, and not in the limited sense in which it is sometimes used with reference to contracts of brokers, employed merely to find purchasers, with whom the principal deals directly.

While we find no case in this state directly in point, our attention has been called to three in other jurisdictions, which support the conclusion reached by us. Garnhart v. Rentchler, 72 Ill. 535; Humphries v. Smith, 5 Ga. App. 340, 63 S. E. 248; Creveling v. Wood, 95 Pa. 152. It is claimed that the authority of the last case cited is weakened by a later decision in Restein v. McCadden, 166 Pa. 340, 31 Atl. 99; but from the report of that case it would appear that the plaintiff was employed strictly as a broker. Perhaps the first case cited is nearest in point. In that case an agent to sell machines was required to deliver and set them up, to start them and remedy any complaint within his power; in other words, he was not a mere broker. In this case the plaintiff was to make deliveries. The point is that the agent earns his commission when his work is done, if he is a mere broker, when he produces an acceptable customer, if a factor, an agent to obtain and fill orders, when he has made delivery.

If the defendant had prevented the plaintiff from making deliveries, a different question would be presented. See Wakeman v. Wheeler & Wilson Manufacturing Company, 101 N. Y. 205, 4 N. E. 264, 54 Am. Rep. 676; Taylor v. Enoch Morgan's Sons Company, 124 N. Y. 184, 26 N. E. 314.

The judgment and order should be reversed, and a new trial granted, with costs to appellant to abide event. All concur.