See, also, D.C., 119 F.Supp. 224.

**Jack GLICK, Plaintiff,**
v.
**EMPIRE BOX CORPORATION, Defendant.**

United States District Court
S. D. New York.
July 26, 1956.

Charles Gottlieb, New York City, for plaintiff.

Gainsburg, Gottlieb, Levitan & Cole, New York City, Samuel Gottlieb, Harry Giesow, New York City, of counsel, for defendant.

LEVET, District Judge.

Motion is made by the plaintiff for summary judgment and the defendant counters by motion for similar relief.

The defendant, Empire Box Corporation, is a Delaware corporation which manufactures paper cartons and containers in a plant located at Garfield, New Jersey.

Prior to May 1951, the defendant had done no business with the Pepsi-Cola Company which then owned seventeen bottling plants, of which sixteen are located East of the Mississippi River and one in Houston, Texas. Other plant owners are licensed to bottle Pepsi-Cola and they are referred to as "franchise plants." Raw materials suppliers to the Pepsi-Cola bottling plants must first obtain authorization or license from the Pepsi-Cola Company to imprint its trademark and trade-name on the goods to be sold, including cartons, in which the bottles are contained.

In May 1951, Glick, the plaintiff herein, brought to one Ted W. Ross, then vice-president in charge of sales of the defendant, Empire Box Corporation (hereafter called "Empire"), samples of cardboard carriers which competitors of the defendant were already selling to Pepsi-Cola bottlers. Glick explained to Ross the various tests to which Pepsi-Cola would put any sample carriers. On May 17 or 18, 1951, Glick apparently made some arrangement with Ross. Following the conversation of May 17 or 18, 1951, Glick arranged to introduce Messrs. Klein, president of the defendant, Empire, and Ross, vice-president, to the officials of the Pepsi-Cola Company, which introduction occurred on May 22, 1951. Following this occasion, Messrs. Klein, Ross and Glick conferred. A few days later, Ross submitted to Glick a letter dated May 31, 1951, which purported to incorporate the oral arrangement. Glick wanted the word "six" in front of "bottle carton requirements" eliminated. This was done by a letter dated July 2, 1951, signed personally by Klein, Glick signing by way of acceptance. This letter provides in part as follows:

"On all orders received from the Pepsi-Cola Bottling Plants outside of the Metropolitan Area, where you are not able to personally solicit and service the business, the rate of commission will be 2%.

"On all orders received from Pepsi-Cola Bottling Plants in the Metropolitan Area where you will actively solicit and service such orders, the rate of commission will be 4%.

"If and when our Carton is accepted you should then give us a list of accounts which you will call on personally, and if we approve that list then during the period of this relationship you will receive 4% on such orders."

Pursuant to a letter dated December 27, 1951, the Pepsi-Cola Company authorized the defendant to use the Pepsi-Cola trademark on carriers. Prior to the written authorization of December 27, 1951, and on August 29, 1951, the Pepsi-Cola Company had given a sample order of 200 carriers to be delivered to a company-owned plant in Jersey City, New Jersey. Thereafter, Glick visited Pepsi-Cola's main office on West 27th Street, New York, N. Y. and company-owned plants in Long Island City and fostered the good-will of defendant with the Pepsi-Cola Company. As a result of the sponsorship by the home office of Pepsi-Cola and the Long Island City plant, defendant supplied carriers to six other company-owned plants located in Alexandria, Virginia; Jersey City, New Jersey; Nashville, Tennessee; Pittsburgh, Pennsylvania; Teterboro, New Jersey; Agawam, Massachusetts; and Milwaukee, Wisconsin. In addition, the defendant, through its salesmen, sold and delivered carriers to 34 so-called "franchise plants." A plant in South Bend, Indiana, which plaintiff appears to have believed was owned by the defendant, but which actually was owned by an Indiana corporation and was operated under the same name as the defendant, sold cartons to the company-owned plants at Nashville, Tennessee and Pittsburgh, Pennsylvania, and to a great number of franchise plants which were not solicited nor serviced by Glick.

The defendant, Empire, paid Glick 4% on all carriers it sold to the company-owned plants and 2% on carriers it sold to franchise plants. Empire Box Corporation of South Bend, the Indiana corporation, paid plaintiff commissions at the same rate.

On October 10, 1952, the defendant, Empire, wrote a letter, signed by its president, Stanley J. Klein, in which it advised Glick that it wanted to terminate the relationship between the parties, the actual words used being "we want to terminate your employment." Out of this contractual situation and as a result of the October 10, 1952, letter, this action arose.

Plaintiff pleads three causes of action:

(1) The first asks recovery on the letter dated July 2, 1951;

(2) The second alleges an oral agreement entered into on May 22, 1951, to pay brokerage commissions; and further that the oral agreement was reduced to the writing of July 2, 1951;

(3) The third seeks recovery for brokerage services on the theory of quantum meruit.

The plaintiff contends:

(1) That the letter agreement constituted a contract wherein the defendant agreed to pay the plaintiff 4% on all orders received from Pepsi-Cola bottling plants;

(2) That by paragraph 2 of the letter of July 2, 1951, defendant agreed to pay plaintiff 2% commission on orders received from Pepsi-Cola bottling plants outside the metropolitan area where the plaintiff was not able to solicit personally and service the business;

(3) That by paragraph 3 of the letter of July 2, 1951, defendant agreed to pay plaintiff 4% commission on all orders received from Pepsi-Cola bottling plants in the metropolitan area where plaintiff actively solicited and serviced such orders;

(4) That by paragraph 4 of the said letter 4% on such orders was to be paid to plaintiff "during the period of this relationship."

Although the consideration for the obligation to pay the 2% commission is not set forth in the writing, plaintiff claims that the consideration for this promise was his introducing the Pepsi-Cola business to defendant. The defendant, however, in effect contends that the consideration was not plaintiff's services in introducing the bottle carriers to defendant, but was a bonus for plaintiff's prospective work in actually soliciting and servicing the 4% accounts. The answer of the defendant admits the execution of the agreement but denies other allegations of the complaint and pleads that the obligations undertaken by the writing of July 2, 1951, were terminated by notice in writing dated October 10, 1952. To substantiate this position, the defendant contends that plaintiff was not entitled to compensation as an alleged broker for the mere introduction of defendant to Pepsi-Cola; that this relationship was that of employer-salesman and that plaintiff to earn the commission equal to 4% of the orders received from Pepsi-Cola was obliged to "actively solicit and service such orders."

The defendant cites Hooper v. People of State of California, 155 U.S. 648, 15 S.Ct. 207, 39 L.Ed. 297 and Hall v. French-American Wine Co., 149 App.Div. 609, 134 N.Y.S. 158, to distinguish between brokerage and other relationships, and then states: "It is patent that the relationship here was not that of broker and principal for plaintiff's duties did not terminate as they would if he were a 'mere broker' upon the production of the customer." Defendant also relies on sales slips in which plaintiff is referred to as a "salesman." Such assertions are not conclusive of the issues of this case. The real question still is what is the contract. Categorical classifications are useless here.

At least the following matters are in dispute in this action:

(1) In the first cause of action the plaintiff alleges due performance, etc. (Para. 3.) This is denied by the defendant. The plaintiff alleges in effect that the oral agreement, said to be confirmed by the letter of July 2, 1951, was based upon a so-called brokerage agreement to obtain the patronage of Pepsi-Cola for the defendant, Empire. (See affidavit of Glick, pp. 2–10.) An entirely different version is set forth by Ross in his affidavit. (Pp. 1–3.) Ross says, among other things: "In my talks with

the plaintiff, it was made clear that the commission arrangement would continue only so long as his employment with us continued. I advised him that that was in accord with the usual company practice." (P. 2.) The letter agreement of July 2, 1951, is silent as to the duration of the 2% payments;

(2) If the 4% clause is severable from the 2% clause, what is the agreement with respect to its duration? Plaintiff in his reply memorandum (pp. 12–14) appears to concede that the term of the 4% clause of paragraph 3 of the writing created the relationship of employer and salesman and was terminable at will, but he claims that the 2% clause gave rise to a relationship of principal and broker;

(3) Plaintiff concedes in effect that extrinsic parol evidence is necessary here to show consideration for the 2% payments of paragraph 2. As to the facts relating to this issue, there appears to be a dispute. The excerpts from the plaintiff's examination before trial, set forth in the affidavit of William Felstiner (pp. 3, 4) do not tend to support plaintiff's claim of a brokerage agreement for payment of 2%.

Plaintiff in his affidavit in support of his motion for summary judgment states that he had originally asked for a flat 5% commission on carrier sales to the Pepsi-Cola Company solely for his services in initiating the flow of carrier sales by defendant to said Pepsi-Cola Company and without his solicitation of orders. Plaintiff further states that Ross informed him that defendant could only give him a flat 2% commission on all such sales since defendant's salesmen would have to solicit orders and service the various bottling plants and that the double commission would "make the business impossible." Whereupon, plaintiff states he informed Ross that he was willing to solicit orders from Pepsi-Cola Company's own plants in the metropolitan area. Plaintiff asserts that thereafter Ross advised him that he was authorized to give plaintiff an extra 2% on orders from all plants which plaintiff solicited. These facts, if proven, would support plaintiff's claim that his solicitation of Pepsi-Cola bottling plants was not a condition precedent to defendant's duty of performance, namely, the payment of a 2% commission on all orders received, whether or not such orders originated from the metropolitan area. However, these alleged facts are controverted by Ross' affidavit, in which he states that the 2% commission on sales not actually solicited by plaintiff was intended as an extra bonus for the work to be done by plaintiff in selling and servicing the Pepsi-Cola bottling plants in the metropolitan area. If these facts are correct, plaintiff's right to a 2% commission on non-local orders was conditioned upon his solicitation of local Pepsi-Cola bottling plants.

■ Under the circumstances of this case, there are triable issues of fact, including those above stated. Summary judgment is a drastic remedy granted only upon a clear showing that there are no such triable issues. This is not true here. Both motions for summary judgment are, therefore, denied.

So ordered.