Millard L. Midonick, S.
The. decedent in this case was Mark Rothko. He was one of the foremost painters of the New York school, also known as abstract expressionists, and at the time of his death on February 25, 1970 he was considered a first ranking artist of longtime standing in one of the leading schools of art then recognized as such throughout the art world. His reputation and the cultural impact of this artist and his school upon the world are detailed later in this opinion when the discussion turns to the value of his various paintings owned by his estate.
The petitioners, the two children of the testator, seek to set aside two agreements dated May 21, 1970, made by the three executors, with two respondent Marlborough corporations whose business transactions are admittedly directed and controlled by Francis K. Lloyd. The petitioning children also seek restitution to the decedent’s estate of 798 paintings executed by the testator and owned by him at the time of his death, 100 of which were sold by the executors to the respondent, Marl *835 borough A. G., a Leichtenstein corporation, by one of said agreements marked Petitioner’s Exhibit No. 1, and the balance of 698 were consigned for sale by the executors by the other of said agreements marked Petitioner’s Exhibit No. 2 to the respondent Marlborough Gallery, Inc., a New York corporation. The term of the consignment agreement is for 12 years. To the extent that restitution of all of the paintings cannot be achieved by reason of passage of good title to nonparty purchasers from either of respondent Marlboroughs, 71 paintings of the 100 sold under Petitioner’s Exhibit Nos. 1 and 69 of the 698 consigned under Petitioner’s Exhibit No. 2, the children of the testator pray that the estate should be restored to its original condition by restitution payments, by damages imposed upon the contracting Marlboroughs and Francis K. Lloyd for alleged violation of a restraining order of this court affirmed by the Appellate Division, and by other remedies, and they demand that Marlboroughs and Lloyd pay the children’s counsel fees as well. These petitioning children also seek the removal of the three executors, denial of their commissions and their counsel fees from the estate, and payment by the executors of the children’s own counsel fees, and that they be surcharged for breach of their fiduciary duties. The Attorney-General of the State of New York who intervened, representing the public as ultimate charitable beneficiaries of half of the estate, seeks essentially the same relief by cross petition. Another intervenor, the Mark Rothko Foundation, Inc., beneficiary of half of the estate for charitable uses, with these executors on its board of directors in varying proportions from time to time, opposes the basic relief demanded by the children and the Attorney-General, urging that the Marlborough respondents retain control of the estate paintings.
The three petitioners allege and have sought to prove that the respondent executors Bernard J. Reis and Theodoros Stamos have each been involved in a conflict of interest and duality of position in the making and performance of the said agreements with the respondents Marlboroughs. The third executor, the respondent Morton Levine, not charged with a conflict of interest, was alleged to have acted improvidently and with negligence in joining in the sale and consignment to the Marlboroughs, with knowledge of alleged conflicts of interest of his cofiduciaries. All the executors are jointly and severally charged with failure to enforce the performance of *836 the said agreements properly, whether or not the agreements are vulnerable as voidable.
Since June 26, 1972, the respondents Marlboroughs and the executors, and their agents, have been restrained by this court from "selling or otherwise disposing” of any of the paintings affected by the two agreements, except with the express permission of this court, which permission has not been sought (Matter of Rothko, 71 Misc 2d 320, mod and affd 40 AD2d 965).
The more recent (1974) allegations by the petitioners accuse the respondents Marlboroughs, and have for this aspect added Francis K. Lloyd personally for the first time as a party respondent, of violation of the said injunctive restraints against selling or otherwise disposing of estate paintings, and now seek findings of contempt and damages against Lloyd as well, restitution against him as well for many paintings allegedly sold or disposed of shortly after the temporary restraining order of June 26, 1972, and after the injunction pendente lite of September 1972, and they seek against him as well judgment for the petitioners’ own^ counsel fees.
The respondents Marlboroughs and Lloyd and the respondents-executors Reis and Stamos deny all of the allegations of wrongdoing. The respondent-executor Levine, who is not involved in conflict of interest allegations, denies his responsibility for any wrongdoing by his coexecutors and of the Marlboroughs. He claims to have been misled by his coexecutors by their concealment of facts from him.
The will gave the children nothing in the event of survival of the testator by his widow, their mother, who died six months after the testator, having received under testator’s will $250,000 and the family residence and its contents. However, the testator’s children successfully elected to take against the excessive charitable disposition of more than one half of the estate (71 Misc 2d 74, affd 43 AD2d 819). As a result of the elections of the children, the respondent, Mark Rothko Foundation, Inc., a charitable foundation, is limited in its benefits to the extent of one half of the net estate after debts. The Foundation intervened as a party respondent. Of its seven directors, the testator was one until his death, and the three executors were also directors until 1972, when Levine resigned during the course of this proceeding, leaving Reis and Stamos still in office. The Foundation has denied allegations of wrongdoing levelled against the executors and the Marlbor *837 oughs and asserts that rescission of the agreements may result in diminution of the estate. The Foundation, unlike the petitioning children of the testator, does not seek to receive paintings from the estate in kind, or restitution or damages. Nor does it contend, as do petitioners, that estate paintings, at least some of them, should be sold, lent or given to museums to preserve for public access the cultural heritage of the testator’s masterpieces. The foundation, whose purposes were expressed vaguely during the testator’s lifetime, amended its certificate of incorporation after his death, to confine its purposes to the financial assistance of mature artists in need of such help.
The will, probated without objection, was drafted, and its execution supervised on September 13, 1968, solely by Bernard J. Reis, one of the respondent-executors. He was 79 years of age in 1974, has been for all of his professional life a certified public accountant licensed by the State of New York, was graduated from law school but has not been licensed to practice law. Bernard Reis was an intimate friend and confidant of the testator, and acted for years as his business and professional advisor.
According to the corporate minutes and other evidence before the court, Bernard Reis was elected a director, secretary and treasurer of Marlborough Gallery, Inc., the New York corporate consignee, hereafter sometimes called MNY, on January 30, 1970. On February 25, 1970, the testator took his life. On April 30, 1970, Reis’ salary commenced at the rate of $20,000 per year for part-time services to MNY as such corporate officer. He paid the salary of his own personal secretary, amounting to $12,000 per year. The contracts complained of were signed by Reis and the other two executors on May 21, 1970 and by the respondents Marlboroughs shortly thereafter.
The contention that the testator knew of Reis’ conflict of interest, as set out above, is further supported by the circumstances that Reis’ independent accounting firm, of which he was a partner, served MNY for its accounting work for some years before the testator’s death and until Reis joined the staff of MNY. But it is not a defense to prove that a testator knew of a conflict of interest when and after he named Reis in his will as his fiduciary. The classic and everyday example of such estate planning, occurs when testamentary instruments are executed naming a spouse as executor or executrix, together *838 with provision that the spouse-fiduciary be one of several beneficiaries of the decedent’s estate. That self-evident conflict of interest is intended and forgiven ab initio; but the use of the fiduciary’s conflicting positions to benefit the fiduciary to the detriment of the estate is not contemplated or excused by the testamentary instrument. A fiduciary faced by a problem of conflict of interest should not use his dual position to deal for his own self-interest with the corporation to which he owes a conflicting duty as director and officer, in the disposition of estate or trust property without prior court approval (Matter of Scarborough Props. Corp., 25 NY2d 553). He cannot serve two masters, and if he has a conflict between his duty to his estate and his duty to his corporation, he must resign or seek the direction of the court in advance. The use of his fiduciary position to gain a benefit for a third person also constitutes an act of disloyalty (Bogert, Trusts and Estates, [2d ed], § 481, p 130).
Reis was squarely faced on and after the death of Mark Rothko on February 25, 1970, with his dual status as (a) named executor (one of three) in the will, drawn and executed under his supervision, and (b) independent accountant turned salaried director-secretary-treasurer of MNY with whom the testator had a 1969 inter vivos contract for an eight-year exclusive agency to sell his work. Whether or not that agreement survived the death of the testator without expressly so providing was a problem that a fiduciary in a dual position of serving both parties to the contract could not have impartially faced. Nevertheless, Reis qualified as an executor and has continued to serve in that capacity. At no time has he resigned as director or secretary or treasurer of MNY, nor has he declined his salary as an officer of MNY. The $20,000 per year has more recently been segregated, $8,000 to him and $12,000 to his personal secretary. He contends that as a person of substantial independent wealth and income his status as a director and officer to MNY was of little significance. Such protestation is not persuasive in view of the prestige of MNY and its directorships and officerships and in view of Reis’ tenacious continuation in this position at all times after the testator’s death and currently. Despite Reis’ contention that the MNY association was inconsequential to him, the dual status he has clung to imposed upon him an extraordinary head-on conflict. His primary duty as an estate fiduciary was to obtain terms the most advantageous for the *839 estate in its dealings and negotiations with MNY and its affiliate Marlborough, A. G., herein sometimes called MAG. His conflicting duty as a director of MNY was to bargain precisely in opposition. Faced with this evident conflict, he wrote to his fellow executors in a memorandum of April 30, 1970, that Francis K. Lloyd, also known as Frank Lloyd, was anxious, and so was he (Reis), to conclude quickly a deal for the liquidation by Lloyd’s organizations of the entire inventory of 798 Rothko pictures owned by the estate. (An additional group of about 44 Rothko paintings might have been covered under the consignment agreement, but for the later decision that they were part of all the "contents” of the residence on East 95th Street in the County of New York which was given by the Rothko will to his widow if she survived him [which she did by about six months] or if not, to his children; the widow’s will bequeathed these 44 paintings to the children [Matter of Rothko, 77 Misc 2d 168, affd 47 AD2d 623]). Reis wrote that in pursuance of this, plan, he, Reis, had arranged for meetings between the executors, their legal counsel (whom only Reis of the three executors had known for years and had persuaded the two other executors to employ), and Lloyd on May 5 and 6 of 1970. Reis also advised his fellow executors that because of his dual position, he would abstain from the negotiations except that he reserved the power to disapprove or to ratify, if agreeable to him, what the other two fiduciaries would agree upon as final terms with Lloyd. This letter clearly informed the coexecutors of the conflict of interest existing in Reis’ positions.
The law firm so chosen by the executors prepared for these negotiations by researching and composing a letter of advice and guidance extending over six typewritten pages. In this letter, dated May 14, 1970, counsel advised the executors that they approved of Reis’ abstention and exclusion from the imminent negotiations because "there is a conflict of interest between your status as Executor of the Estate and your position with the Marlborough Gallery in New York”.
The testimony of the draftsman of the letter, one of the partners of that law firm who was involved in the contract negotiations, that the letter should have expressed more accurately the situation as a "seeming conflict of interest”, is contrary to this court’s findings that the conflict was real as well as apparent. Nowhere in the letter of legal advice was it *840 suggested that Reis resign his corporate association with MNY in order to eliminate the conflict of interest.
By the same letter, this law firm advised the executors that a petition for advance approval of any contracts for liquidation of the estate through Marlborough Galleries would not be entertained by a Surrogate. While it is true, as the law firm advised, that Surrogates do not usually give advance approval concerning matters of business judgment which are within the province of executors, no indication was given that the opposite rule governs when a fiduciary faces a conflict of interest. A partner of this law firm testified that the firm was well aware of the Matter of Scarborough Props. Corp. (25 NY2d 553, supra and Matter of Ebbets (139 Misc 250) decisions, but did not mention them or the doctrine concerning conflicts of interest, because those cases were in the firm’s opinion distinguishable from this one.
Scarborough is claimed to be inapposite because there the fiduciary was buying trust property for himself, whereas here Reis did not own any part of MNY or Lloyd’s other affiliates and was therefore, so it is argued, not in a dual position. The court disagrees with this view of Scarborough. In Scarborough one of the trustees, Dudley Schoales, sought to purchase a parcel of realty known as "Beechwood” which was owned by the Scarborough Properties Corporation. Thirty-two percent of the stock interest in Scarborough properties was held in various family trusts, 11% in a testamentary trust created by a Mr. Vanderlip and 21% in inter vivos trusts set up by Mrs. Vanderlip. Dudley Schoales was one of the trustees of the inter vivos trusts. The Court of Appeals in its decision on page 558 referred to the "able and thorough opinion” of Supreme Court Justice Galloway where he noted that "this is not the case of a ['self-dealing’] trustee selling his trust assets to himself at private sale”, pointing out that "[t]he corporate owner of 'Beechwood’ proposes to convey that property to one of several trustees who hold slightly less than one-third of the corporation’s outstanding stock.” The court went on to determine that in light of the presence of such conflict of interest the case was a proper one for judicial scrutiny referring to Matter of Hubbell (302 NY 246). In Hubbell the court had stated, at page 254, "the propriety of the sale to the Corporation has not hitherto been reviewed by any court. A most unfortunate circumstance, for had the problem been submitted to the Surrogate when it first presented itself to the *841 trustees, at the inception of difficulties, the present controversy would in all probability have been avoided and there would be no need to assay these transactions in the light of hindsight.” In the instant case it is true that Reis was not proposing to purchase property from the estate but he was a director and a secretary and treasurer of MNY, a consignee, and was in a dual position (cf. Munson v Syracuse, Geneva and Corning R. R. Co., 103 NY 58).
The Ebbets case (139 Misc 250, supra), relied upon at trial by counsel for two of the executors for the proposition that no Surrogate would give advice to a fiduciary, involved no conflict of interest situation at all. Surrogate Wingate of Kings County did decline to approve in advance the mortgaging of trust property, but nonetheless the court did compliment the trustees for airing the proposed transaction in advance by citing all of the beneficiaries, who appeared for the hearing, and expressed themselves in favor of the proposal. The Surrogate indicated that all these circumstances would seem to require going ahead with the proposed transaction to mortgage Ebbets Field in order to build an expanded seating capacity although the court could not formally approve of it in advance. Where conflict of interests did exist, the Court of Appeals in Scarborough (supra), did affirm advance approval by the trial court of a trustee’s proposed business purchase. It is most regrettable that the heavy burden of this litigation on all parties and all counsel was not avoided by resort to this court for such approval of the proposed contracts before their execution and effectuation.
In this Rothko situation at bar, if such procedure had been followed, guardians for the infant beneficiaries may well have argued for better contract terms in the nature of the analysis set forth above. Like some of the other beneficiaries in Scarborough, the Mark Rothko Foundation might have approved the proposed contracts as they were offered by Lloyd for his Marlborough corporations. The court would have had to rule on these proposals because of the "conflict of interest”, as held in Scarborough.
If the court ruling had insisted on improved terms, the Marlborough interests would have the same option as the Scarborough trustee to accept or decline the new terms. If no terms satisfactory to the court could have been mutually reached, no contracts should have been made while Reis held his conflicting offices on both sides of the transaction. Apart *842 from Reis’ and Marlborough’s previous experience with prior approval by Surrogate Cox in 1965 in the estate of the artist Franz Kline, Reis must be held to at least the same standard of care that his cofiduciaries should have met since he too should have been dissatisfied with the terms of the proposed agreements as a matter of business judgment, and, being in a conflict of interest position, should have sought prior approval from this court. Instead he congratulated his cofiduciaries on their negotiation and signed the agreements with alacrity; and then he materially altered the consignment agreement in further detriment to his trust duty to the estate while strengthening MNY where he was a director, without consulting or informing his cofiduciaries or his attorneys.
Trial counsel for Reis urges that personal "aggrandizement” is prerequisite to a finding of a breach of duty of loyalty. But Reis’ aggrandizement or self-interest, weighty enough to cause him in these transactions to favor the corporation of which he was a director, was palpable enough. He himself wrote to his fellow executors that both he and Lloyd were anxious to conclude a liquidation arrangement quickly. The stakes were obviously millions of dollars of potential profits for the respondents Marlboroughs. What part of those profits would flow to the estate was a matter of crucial interest both to Reis as a fiduciary estate executor and to Reis as a director and therefore fiduciary to the conflicting Lloyd interests. If Reis were to exercise an interfering, restraining, enhancing or opposing influence on the part of the estate, contrary to Lloyd’s wishes, Reis’ future with MNY, Lloyd’s company, was hostage. Admittedly a fiduciary for these conflicting interests, Reis was not free to involve himself vigorously on the part of the estate. Any transmission of intelligence supposedly privy only to the executors, such as the Saidenberg appraisals, by Reis qua executor to Lloyd negotiating for purchaser and consignee, would undermine the estate’s position. Reis’ duty should have led to his afiirmatively advising his coexecutors of Rothko sales proceeds obtained by Marlborough transactions since 1963 which he knew better than they. This information he must have had due to his many years as accountant for Rothko and for Marlborough as well, before he became a Marlborough director and officer. No such precise information was made available to the other executors by Reis or Lloyd, nor did any executor demand to know. This court finds that the prestige and status of Reis as a director, secretary and *843 treasurer of MNY, apart from his salary as secretary-treasurer provided by Lloyd’s MNY, and his fringe benefits and perquisites, were quite important to Reis’ life style. The court infers and finds that Reis was concerned and insistent on the continuation of this prestigious status. He was known and wanted to be known as a collector of valuable masterworks of many artists. He continued to sell some of his and his family’s private collection for substantial sums through MNY before, during and after the critical period of these estate negotiations. Even though MNY appears to have used the same 20% formula for commissions for selling Reis’ consigned paintings as for those owned by other collectors, the elaborate color catalogues and efforts of Marlborough promotion on behalf of Reis were extraordinary when compared to efforts in behalf of other collectors. Reis’ and his immediate family’s share of such sales by Marlborough of part of their private collections for about eight years before through two years after the May 21, 1970 estate contracts here complained of, aggregated for Reis and his family almost $1,000,000. Air tickets to and from Venice and Houston were supplied to Reis by MNY purportedly to help MNY promote the enhancement of Mark Rothko’s work after his death. It would seem that this aspect, and other aspects of his part-time association with MNY, were amenities of a prestigious and undemanding nature which he did not wish to relinquish. The other two executors declined free trips to Venice. Levine testified and the court finds that he declined an offer by Lloyd of a "subvention” to pay for publication of a biography of Rothko which Lloyd tried to persuade Levine to write. Levine cautioned Lloyd not to pay him, as Lloyd had offered, for use of a Rothko funeral eulogy written by Levine and then printed in the Venice Rothko show catalogue by MNY, but Lloyd sent him a check, nevertheless. Levine rejected this check. Levine is a professor of anthropology and head of that department at Fordham University. Stamos is an artist in his own right.
In sum, the substantial private wealth of Reis, his retirement from his accounting partnership, and his advanced age, all point to his shift of primary motivation of financial aggrandizement in favor of his aggrandizement of status as well as his financial aggrandizement through sales of his own and his family’s art collections through his association with the cultural business of the Marlborough interests. Had he served the single interests of his fiduciary duty to the Rothko estate, *844 he would have increased his commissions as an executor by enhancing the value of the estate (whether by sales or distributions in kind), but he would have risked the loss of his status with the Marlborough interests as well as their worldwide galleries and expertise in liquidating for his enormous financial stake in his own and his family’s extensive private art collection. His conduct does not amount to self-dealing in the sense of buying or selling assets directly to or from the estate for his own personal account but the court deems this breach of loyalty, where a fiduciary benefits himself indirectly at the expense of the estate, to be the equivalent of self-dealing.
That Reis was in a position of serious conflict of interest and divided loyalty in respect to the questioned estate contracts dated May 21, 1970, appears beyond doubt. The position of Stamos in respect to his own loyalty and conflict of interest, despite his clear improvidence and gross negligence, is not as certain. Stamos did enter into his personal contract as an artist with MNY on January 1, 1971 whereby Marlborough became Stamos’ exclusive art dealer agent at a commission of 40%, soon amended on January 5, 1971 to provide for a commission of 50%. It is of interest that this contract was more advantageous to the artist than the consignment contract he made with Marlborough for the estate in that (1) initially the commission rate was 40% as contrasted with 50% charged the estate, (2) the duration of the contract was four years as compared with the estate contract of 12 years and, most importantly, (3) the Stamos contract permitted him to fix minimum sales prices while the estate contract required only that sales be at "the best prices obtainable but not less than the appraised value of the Estate.” Moreover Stamos’ contract contained a provision for a drawing against his potential sales which proved to exceed substantially the eventual sales of his work.
Executor Levine stated, and the court finds, that in a conversation in April, 1970, before the execution of the questioned agreements, executor Stamos related that Marlborough had evidenced interest in his paintings. This conversation led Levine to believe that Stamos was interested in entering into some contractual arrangement with Marlborough which indicated a conflict of interest on the part of Stamos. Levine testified that when he confronted Stamos with the impropriety of such motivation angry exchanges followed.
*845 While the existence of this conversation depends wholly on the testimony of Levine, denied by Stamos, credibility is lent to Levine’s testimony because it constituted an admission by Levine that he was aware not only of Reis’ dual interests but he also believed that Stamos had conflicting interests because of expectation of benefits from Marlborough. In such a circumstance Levine must have, and should have, entertained suspicions as to the advisability of the proposed terms of Marlborough contracts, and indeed he did.
The fact that Stamos did consummate a favorable contract with Marlborough within months after the signing of the estate contracts not only further supports Levine’s testimony, but also certainly placed Stamos in a position in which his personal interests did conflict with the interests of the estate, especially leading to lax estate contract enforcement efforts by Stamos. The purchase, by Marlborough of a Stamos painting from a third party at the Parke-Bernet auction at a price of $4,000 during the week in May, 1970 while the estate contract negotiations were pending, was an act which added to Stamos’ reputation as an artist and could have influenced Stamos’ attitude toward Marlborough. Stamos’ denial that he knew of the Parke-Bernet public auction sale ifi New York City of his painting, even though sold by a third party to Marlborough, is not credited by the court.
Stamos did not occupy the same position as Reis but he also had personal interests to be served in the enhancement of his artistic career. The possibility that Stamos was negotiating for a contract with Marlborough prior to the execution of the estate contracts involves conflicting evidence but it was to his advantage as a not-too-successful artist, financially, to curry favor with Marlborough. Levine and Stamos were informed as to Reis’ position, by the latter’s affirmative statement that a conflict of interest existed, and Levine also believed that Stamos was endeavoring to obtain a favorable contract from Marlborough. Thus, although Stamos’ self-serving is not as clearly proved as that of Reis, yet self-serving breach of loyalty is found as to Stamos as well; and apart from self-serving, Stamos acted as improvidently and negligently as Levine, in view of his own knowledge of Reis’ self-serving and the entire course of events.
Although Levine was aware of Reis’ divided loyalty and believed that Stamos also was seeking personal advantage, he followed their leadership without investigation of essential *846 facts such as prior Marlborough sales of Rothko’s works, without seeking competent and disinterested appraisals, and no art merchandising expert whatever was consulted. Surely Lloyd’s expertise was not to be relied upon as disinterested advice. Levine was not an artist, but his long association with Rothko led him to believe that the 100 paintings were worth $3,000,000 on cash terms, and not the $1,800,000 payable over 12 years for which they were sold; and Levine regarded the Saidenberg appraisal of $750,000 as absurdly low, as did Stamos. Despite Levine’s knowledge of the facts which motivated Reis and apparently Stamos to rush into contracts, and his personal beliefs as to the value of the paintings, he did not urge either delay or the procurement of additional appraisals or disinterested art merchandising advice, but docilely lent his approval to a deal of which he was distrustful. He also joined with his coexecutors in opposing the elections of the children, although it was not the duty of a fiduciary to take a partisan attitude as between the children and the charitable foundation. It was not until later in the litigation that he altered his position in an attempt to shed himself of personal liability. It is recognized that Levine was neither an art expert nor an experienced fiduciary -but he was an educated man who, despite his educational background and his position as a college professor, failed to exercise ordinary prudence in his performance of fiduciary obligations which he assumed. Levine’s argument at best is a statement that he undertook a responsibility which he was unqualified to handle and cannot perform more capably in the future. In short, his performance as an executor has demonstrated his inability to continue to occupy that position. The court would have preferred to avoid surcharging Levine because of his candor during the trial by giving evidence of the internal deliberations of the executors, but the precedents of the appellate courts constrain this court from giving such favored treatment.
Levine’s help as a candid witness, his verbal protests, and absence of self-interest or bad faith motives, while not sufficient to afford him continuance in office or statutory commissions, might well be the ground for relieving him of surcharge. But such is not the law until the appellate courts so speak. All we can find in his favor is a lower measure of damages, as indicated below.
With respect to Reis there can be no question as to his dual role and his planned purpose to benefit the Marlborough *847 interests to the detriment of the estate. His conduct constitutes an obvious position of breach of duty of loyalty.
None of the executors acted innocently and without knowledge of entanglements involved in the contractual negotiations and in their failure to enforce the consignment contract.
"For injuries to our rights from the fraudulent acts or deceptions of others we are allowed to seek redress, but for the consequences to ourselves of poor advice from others, of our own mistakes of judgments in business affairs, or with respect to the capacity of persons whom we employ, I see no relief in the law.” (Matter of Niles, 113 NY 547, 558-559 [Gray, J].)
"Ordinarily one of several executors 'is responsible for his own acts, and not for those of his associates’ (Croft v. Williams, 88 N.Y. 384, 388), but if he knows of, and consents to, his coexecutor’s misapplication of estate funds, he becomes responsible for what the other has received.” (Matter of Horowitz, 297 NY 252, 258, citing numerous authorities.)
Further authority for holding an executor liable for participation in the wrongful acts of his coexecutor is found in Matter of Durston (297 NY 64, 72-73). (See, also, Liability of Cofiduciary, 65 ALR2d 1019.)
Only by written and timely dissent, not by written concurrence, could Levine have begun to exculpate himself completely. (EPTL 10-10.7.)
Turning now to Reis and Stamos and their breach of duty of loyalty it is doubtful, even if there had been adequate consideration and proper enforcement or performance of the contracts, that the executors would be exonerated. As it was held in City Bank Farmers Trust Co. v Cannon (291 NY 125, 131-132): "The standard of loyalty in trust relations does not permit a trustee to create or to occupy a position in which he has interests to serve other than the interest of the trust estate. Undivided loyalty is the supreme test, unlimited and unconfined by the bounds of classified transactions. (Meinhard v. Salmon, 249 N.Y. 458, 464.) * * * when the trustee has a selfish interest which may be served, the law does not stop to inquire whether the trustee’s action or failure to act has been unfairly influenced. It stops the inquiry when the relation is disclosed and sets aside the transaction or refuses to enforce it, and in a proper case, surcharges the trustee as for an unauthorized investment. It is only by rigid adherence to these principles that all temptation can be removed from one *848 acting as a fiduciary to serve his own interest when in conflict with the obligations of his trust. (Dutton v. Willner, 52 N.Y. 312, 318; Munson v. Syracuse G. & C. R. R. Co., 103 N.Y. 58, 74; Meinhard v. Salmon, supra; Wendt v. Fischer, 243 N.Y. 439, 444.) The rule is designed to obliterate all divided loyalties which may creep into a fiduciary relationship and utterly to destroy their effect by making voidable any transactions in which they appear.”
This rule was applied in a situation where a person serving conflicting interests was not certain to benefit from a contract, but where the likelihood was so great that he would be subject to temptations to serve his personal interests. Where a conflict is shown to exist the courts are "more concerned with what might have happened in a given situation than with what actually happened.” (United States v Mississippi Val. Co., 364 US 520, 550.)
In City Bank Farmers Trust Co. v Cannon (291 NY 125, supra), estoppel against the beneficiary was found on the basis of long approval of self-dealing during the life of the settlor of an inter vivos trust who refrained from using his power to revoke or sue; here no question of estoppel arises.
The findings above are made independent of any aspect of value to the estate of the contracts of May 21, 1970, which are complained of by the petitioners. These findings are sufficient to sustain self-interested breach of duty on the part of Reis without more. So also with respect to Stamos. So also with respect to improvidence and unfitness with respect to all executors. (SCPA 711.)
Apart from all else, the executors permitted by the consignment contract the removal of "property of the estate without the state [of New York] without prior approval of the court”, in violation of SCPA 710 (subd 4) and of SCPA 711 (subd 7).
The substantial inadequacy in contract terms amounting to lack of mutuality and fairness in the value of the consideration received by the estate, can be taken into account by way of corroboration or substantiation of the duality of Reis and Stamos and its influence upon their actions, as well as improvidence on the part of all of the executors. The court does infer in support of the independent and sufficient findings of duality made above, that serious deficiencies in the benefits to the estate establish a half-concealed bias on the part of Reis and Stamos to favor Lloyd’s Marlborough interests over that of the estate. Since Reis and Stamos served their selfish interests, it *849 would seem probable that serious inadequacy in terms will be the portion of the estate. It is disheartening also to find Reis, whose duties for MNY were largely focused on accounting, not actually helping to make or insisting on semiannual accountings to the estate as the consignment contract required. No proceeding by Reis or the other executors was commenced against Marlborough for breach of contract or for breach of any other duty. Only after the commencement of this proceeding did Marlborough New York pay over $73,000 to the estate which it had overcharged by giving a dealer’s discount to its affiliate Marlborough A.G. and taking a consignment commission as well. Only after the commencement of this proceeding, one year and a half after the making of the contracts, did the trial counsel for Reis and Stamos, both still allied with Marlborough interests, threaten, when the facts disclosed in this proceeding became too plain to avoid acknowledging, to sue Marlborough at long last, on behalf of the estate at the conclusion of this proceeding. In order to effectuate such a threat of suit against the Marlborough interests, even if it were realistic in view of continuing conflicts of interest, the executors assume that they will remain in office as fiduciaries, which assumption is inconsistent with the suspension and revocation of their letters testamentary hereby ordered due to their misconduct found in this proceeding. This threat also assumes, incorrectly, that this court in this one litigation is incapable of doing justice between the estate and the executors and the Marlboroughs and Francis K. Lloyd. The Appellate Division has affirmed our jurisdiction over the Marlborough respondents. (Matter of Rothko, 69 Misc 2d 752, affd 40 AD2d 1083), and has affirmed further the preliminary order of this court (71 Misc 2d 320, affd 40 AD2d 965), which enjoined respondents pending trial; this restraint was characterized by the Appellate Division as forbidding the "further implementation of contract with Marlborough respondents * * * [i]n view of the duality of positions of two of the executors,” (40 AD2d 965).
The Legislature has given this court "full and complete general jurisdiction in law and in equity to administer justice in all matters relating to the affairs of decedents * * * to try and determine all questions, legal or equitable, arising between any and all of the parties to any action or proceeding, or between any party and any other person having any claim or interest therein * * * as to any and all matters necessary *850 to be determined in order to make a full, equitable and complete disposition of the matter by such order or decree as justice requires.” (SCPA 201, expressly relying upon NY Const, art VI, § 12). This court has been held to retain such full jurisdiction even though another action for partial relief had been pending in the Supreme Court. (Matter of Dunham, 63 Misc 2d 1029, affd 36 AD2d 467, mot for lv to app den 29 NY2d 485; transfer to Surrogate’s Court mandated, 40 AD2d 912; cf. Matter of Raymond v Davis, 248 NY 67, 71, 72; Matter of Young, 80 Misc 2d 937).
If, as the court finds, the 100 canvasses sold by the executors to Marlborough A. G., herein sometimes called MAG, were resold by MAG and its affiliates at retail from 6 to 10 times what MAG undertook to pay to the estate for them, this is substantiation, not unexpected, to reassure a concerned court that the self-interested conduct, independently proved, had the adverse effects upon the estate that the law presumes of fiduciaries not disinterestedly pursuing their duty of sole loyalty to their trust.
The 1970 Marlborough sales alone, early in the Lloyd promotion during the first year after his interests acquired by purchase 100 estate canvasses, averaged approximately six times the value that the estate was promised from MAG under the 12-year, interest-free payout of $1,800,000 for those 100. Discounting the contract price because of the lengthy 12-year payout, the value to the estate should be deemed reduced from $18,000 per canvas for cash, to an average price of about $12,000 per picture. Thus, 12 of the 100 were sold by Marlboroughs in 1970 for $964,750, an average of more than $80,000 per canvas. And this was but the beginning of the escalation in value available to the Marlboroughs and thereafter achieved by them for their benefit despite the unconscionably low provision as to price and the unreasonably long payout term imposed upon the estate.
Also favoring the consignee by its extraordinary length of term, was the companion contract for a 12-year exclusive consignment to respondent Marlborough Gallery, Inc., a New York corporation herein sometimes called MNY. That consignment contract also dated May 21, 1970 affected the other paintings, numbering 698, executed by the decedent and belonging to the estate.
Apart from expert testimony that five or six years should have sufficed for a reasonable time term for a consignment, *851 and even though the decedent in his last troubled year of life granted but eight years to MNY for an exclusive agency on far better terms for the artist, no evidence of any other agreement for a term as long as 12 years was produced by any respondent. The Marlborough interests themselves had many estates of prominent artists. The argument of respondents that the 12-year term was reasonable because of the contract limitation of sale to 70 paintings per year — 35 preabstractexpressionist (pre-1947) and 35 postabstract-expressionist is unconvincing. Firstly, the startling absence of any minimum specific price for any painting (a feature which executor Stamos obtained for himself with MNY in his contract dated January 1971), or any periodic review of such minimum prices by the executors who were the technical title holders of the consigned paintings, gave MNY the opportunity to sell at prices fixed only by itself with consequent danger of collusion, misrepresentation, favoritism, secrecy and outright fraud — all difficult and some impossible to detect. The indefiniteness of the minimum price provision — the "best prices obtainable but not less than the appraised value of the Estate” — is patently inadequate. This clause placed the executors in the untenable position of urging a low estate tax valuation, thereby weakening their own estate’s minimum contract price protection. As for the best prices obtainable, how could the executors successfully oppose the superior but self-interested, expertise of Lloyd and his various presidents, especially McKinney in New York, Somerset in London, Panicali in Rome, and others in New York, Canada, Switzerland, Tokyo, and Lichtenstein who were his employees and who had virtually controlled Rothko’s work since 1963?
Finally, since Reis, acting alone for the estate without the knowledge of his coexecutors or even the estate attorneys, and Levai (a Marlborough executive who is Lloyd’s nephew) acting for MNY, had materially altered the consignment contract by ink and marginal initials after all the executors’ signatures had been affixed, so that it provided that the unsold quota of 35 for any year could be aggregated in succeeding years, this protection for the estate was substantially undermined. Literally, the preabstract expressionist works need not have been sold at all (which they were not) while MNY could sell up to 35 valuable abstract expressionist paintings per year, at prices hopefully bona fide, with the option in the discretion of MNY to aggregate the unsold quota. As the Attorney-General ar *852 gues, "[b]ecause of the lack of controls Marlborough was left free to market those which were most easily and most profitably sold, and then to return the balance at the end of the 12-year period. The result could well have been a lack of effort to sell after the 'cream’ had been skimmed off the top of the estate.”
All of the 100 canvasses sold by the executors to MAG were of the fine, highly marketable abstract expressionist period. Of the entire 798 paintings covered by the contracts, about 400 of the most valuable and saleable paintings were of the post 1947 abstract expressionist school, and of these about 250 were canvasses and about 150 "papers”, also valuable. Thus the consigned paintings numbering 698, included 300 of the most sought after late period and about 400 of far less value and more difficult to sell.
Turning to the commission rate, the consignment agreement provides an unusually, if not grossly, generous 50% for MNY (40% after a dealer’s discount if sold to another dealer). The evidence upon which the court relies indicates that the more important the artist, the lower the commission given to the dealer.
At the time of the contracting here in question, the demand for Rothko’s paintings was such that in terms of marketability he was second to no artist represented by Marlborough, with the possible exception of Jackson Pollock. The reasons given by MNY for the 50% commission were the undertaking by MNY to warehouse, insure, ship, promote and sell at its own expense. MNY argues that therefore the exclusive agency contracts of 1969 made with the decedent inter vivos, including an option in the artist to compel the sale of four paintings per year for eight years at prevailing retail prices, MNY to retain only 10% and the artist to receive 90%, would be unfair due to the added burdens upon MNY under the post mortem consignment contract. Upon analysis, these burdens are not as heavy as to warrant 50% commission for an artist of Rothko’s pre-eminence, stature and marketability. The promise to insure was limited to an aggregate sum of $1,000,-000 for 698 paintings until a higher estate tax valuation might be imposed; and the total insurance, as MNY’s London insurance representative testified, affected each of the consigned paintings as though they were fungible, i.e., at the initial value of less than $1,500 each.
Restoration was left in the discretion of MNY, so that only *853 those paintings sold need be restored, stretched and framed, if restoration and other work were needed at all. Those not restored, were to be returned to the estate after 12 years of warehousing without any obligation to restore or to correct even ordinary deterioration. The evidence was conflicting as to the condition of the estate paintings, but while the burden could not be said to be insubstantial, MNY was in a position to opt to expend such resources only when profitable to it.
Finally, shipping and promoting were at MNY’s discretion as well. Far the most important and heaviest aspect of all was promotion, and in this the Marlborough interests surely excelled. But the benefits ended primarily in Marlborough’s multi-national complex, with no fair share to the estate.
MNY. had consignment contracts with the Jackson Pollock, David Smith and Franz Kline estates, and with other estates as well. Lloyd acknowledged that the Smith estate controlled prices and sales; in July, 1970 Marlborough renegotiated that contract to provide 30% commission on sales up to $38,000 and 25% for amounts above this figure.
Somewhere between 20 and 3310%, perhaps by sliding scale, would have been a reasonable commission contract for the Rothko estate in 1970, according to the expert evidence credited by this court. Pollock, Smith and Kline commissions were all substantially lower than 50% in 1970.
These and other suspicious circumstances can be enumerated: The haste in negotiating the agreements during a period of a few days within three months of the artist’s death. The failure of any executor to consult with independent art merchandising experts when they found the appraisal by Saidenberg at $750,000 for 100 canvasses to be obviously but a fraction of even the wholesale value. The failure of Reis to inform his coexecutors that his selected appraiser Saidenberg had for years been a joint venturer in art dealings with Marlborough-Lloyd interests (between 1968 and 1970 alone, Saidenberg and Lloyd’s interests engaged in joint ventures in art works acquired by them for almost $1,300,000). The evidence that, during the last days of the trial in October, 1974, a medium size canvas of a Rothko painting was sold by one dealer to another dealer for about $142,000, this at a time when the art market was at its recent worst. The failure of Stamos and Levine to inquire into Saidenberg’s connections with Lloyd’s interests even though not so informed by Reis. The many contradictions indicated by Saidenberg’s corrections *854 of his deposition before trial, and the admitted use of Reis’ typewriter to compose the Saidenberg appraisals, leading to the inference that Reis was actively serving Lloyd’s and Marlborough’s interests during the negotiations despite Reis’ pretense of temporary abstention. The disloyal transmission by either Reis or Saidenberg, or both, of the Saidenberg inadequate appraisal of $750,000 which Levine and Stamos and the estate attorneys had commissioned for their own private use, but which the court finds was expressly used by Lloyd in his negotiations with Stamos and Levine when Lloyd made a first offer of $800,000. The failure of any of the • executors to consult with independent art merchandising experts as to whether as many as 100 canvasses should have been sold at all, and what better methods of merchandising could have been insisted upon, including efforts at initial sales to museums. The failure of the executors to inquire of Lloyd as to the prices for which his interests had been selling Rothko works which were sharply escalating during the year before Rothko’s death on February 25, 1970, despite the decline in the stock market which Lloyd used as his repeated argument during negotiations with Levine and Stamos. The failure of the executors to consider or urge waiting out a business recession or that such a recession sometimes firms prices of quality art. The failure to insist that Lloyd divulge not only his recent strong prices of Rothko sales, but also his card index prices of unsold Rothkos to which all his salesmen had to adhere and to which Reis had access. The executors’ failure to test the market themselves (as an alternative to losing control of the estate paintings forthwith) by compelling MNY to sell four paintings at retail for at least one year (90% for the estate) as provided in the inter vivos agreements, which the executors’ lawyers and Lloyd were insisting were binding and prevented competitive bidding. The failure of the executors to use the available information apparent from the 1969 inter vivos Rothko agreements wherein 105 important Rothko canvasses had recently been sold to Lloyd’s interests, to insist on Lloyd’s divulging that he had a large number of such canvasses remaining in his inventory and that he was therefore in a weak position to threaten to cancel the Venice Biennale exhibition unless the whole estate paintings were given over to his possession and control. The failure to insist that MNY had an implied obligation to promote Rothko’s works at the Venice Biennale in 1970 in view of the 1969 inter vivos exclusive Rothko agreements. Levine’s failure to *855 consider whether he should have engaged separate legal counsel under the circumstances as he knew them and Stamos’ similar failure. The curious additional aspect that the only legal counsel present at negotiations were those serving the executors while Lloyd single handedly negotiated complex terms of a multi-million dollar, long-term arrangement, to be reduced to writing by opposing counsel without concern that he have counsel. The alteration by MNY initialled only by Reis and a vice-president of MNY, after all executors had first executed the questioned contracts, materially changing the word "year” to "years” to the detriment of the interest of estate by permitting cumulation of the 35 yearly quota of sales limitation, the alteration made without even the knowledge of counsel to the executors or of the executors other than Reis. The failure of counsel and of Levine and Stamos to discover or complain of this material modification. The absence of any power in behalf of the executors to set and review minimum prices for the 698 consigned paintings, although Stamos was more prudent in his own agreement by which he retained power to set minimum prices. The Pollock and Smith estates minimum price control in their agreements with MNY. The higher estate tax appraisal made by Saidenberg ($1,250,000), having given the executors a lower negotiating appraisal ($750,000) for the same works.
The above findings are far more than sufficient to support the court’s determination that remedial action is required. All these circumstances reinforce the curious atmosphere involving absence of hard bargaining, arms-length negotiations, deliberate consideration and the presence of improvidence and waste verging upon gross negligence on the part of all the executors as well as breach of duty of disinterested loyalty on the part of the executor Reis and the executor Stamos.
Legal advice received by the fiduciaries will not free them from liability. It is important to note that their attorneys never advised the executors that there was no conflict of interest present; on the contrary, their letter of May 14, 1970, directed to the executors, stated that Reis was in a conflict of interest position, and therefore should absent himself from the contract negotiations with the Marlborough interests. All the fiduciaries were aware of the conflict. The legal advice given was that the Surrogate would not entertain a proceeding for approval of the contracts. Reis had appeared in a proceeding before Surrogate Cox in 1965 as an executor in the estate of Franz Kline in which Reis and Marlborough sought and *856 obtained prior approval of a proposed contract made in behalf of that estate for sale of that decedent’s paintings to Marlborough. It is clear that he had reason therefore to question the legal advice given to the fiduciaries. Nor may Levine or Stamos rely on legal advice to exculpate them from responsibility for their actions. An executor who knows that his cofiduciary is committing breaches of trust and takes no steps to prevent or hinder such action, but on the contrary facilitates such conduct, is liable even though he was acting on advice of counsel. In Matter of Westerfield (32 App Div 324, 48 App Div 542, app dsmd 163 NY 209) a fiduciary, Thomas Rogers, was exonerated from any liability for a breach of trust by his cofiduciary Cauldwell which occurred over a certain period of time prior to December, 1895. During this period he had been excluded from management of the trust with the beneficiary’s consent and had no notice of any dereliction. Rogers, however, was held liable for later misapplication of funds by Cauldwell where he had notice and in which he acted. It appeared that under advice of counsel Rogers consented to the conversion of certain mortgages into money and to advances to Cauldwell therefrom secured by real property owned by Cauldwell. Rogers never had any appraisal made as to the value of these properties and accepted Cauldwell’s statements as to value. The Appellate Division Second Department stated (p 344): "It is undisputed that in all of these matters Rogers acted under the advice of counsel, and took no step without consultation. Indeed, the written evidence shows that the counsel originated for the most part the course of dealing with the property transferred by Cauldwell, and advised that it was proper to make the payments which were made. Advice of counsel, however, cannot be held to protect. It still remains that the questions presented were to be solved by business judgment.”
In the instant case the attorney advised the fiduciaries of the conflict of interest and that the Surrogate’s Court would not provide instructions. Even if this advice were correct it would not authorize the fiduciaries to proceed blindly into execution of contracts which were obviously against the interests of the estate. Nor did any legal advice as to the enforceability of the 1969 inter vivos contract free the fiduciaries from employment of their own independent judgment as to the merits of the superseding contracts negotiated with and then placed before them. The decision to enter into these particular *857 agreements was not a legal one but a business decision and all the facts as known to the fiduciaries clearly evidenced that they were detrimental to the best interests of the estate. There rested upon all the fiduciaries the duty to be vigilant and to guard the estate from waste, loss and impairment. A cofiduciary cannot stand by and see improper use made of the assets and thereafter claim immunity grounded upon ignorance of his legal rights and duties or confidence in men misplaced. (Matter of Niles, 113 NY 547; Matter of Silkman, 121 App Div 202, affd 190 NY 560). The actions taken which resulted in the waste and impairment of this estate were of a nature upon which the coexecutors should have been able to form a judgment themselves (Matter of Demmerle, 130 Misc 684) and reliance on the advice of counsel will not protect a fiduciary who is negligent and improvident in his performance of such a task. (3 Scott, Trusts, [3d ed], § 201; see, also, United States v Benjamin, 328 F2d 854, 863). The fact that Levine did not receive any personal gain will not free him from responsibility to the beneficiaries since his improvident actions assisted in causing loss to the estate. The court is therefore constrained to hold Levine liable for his participation in the wrongful acts of his two cofiduciaries. The extent of his liability will be treated later.
The court therefore finds that the acts and failures to act of the three executors were clearly improper under SCPA 711. SCPA 711 (subd 2) provides for revocation of letters on grounds in part as follows: "Where by reason of his having wasted or improperly applied the assets of the estate * * * or otherwise improvidently managed or injured the property committed to his charge or by reason of other misconduct in the execution of his office or dishonesty * * * improvidence or want of understanding, he is unfit for the execution of his office.”
The court determines that the three executors have violated the aforesaid provisions so substantially as to require their removal as fiduciaries of this estate.
The letters issued to the three coexecutors are therefore revoked and they will be held personally liable for damages suffered by the estate. The decree in this proceeding shall include a direction for an accounting by the executors.
The executors are denied commissions. A proceeding for the appointment of one or more administrators c.t.a. shall be instituted.
*858 The contracts for the sale and consignment of paintings are determined to be voidable and are hereby set aside by reason of violation of the duty of loyalty and improvidence of executors, knowingly participated in and induced by the respondent galleries. (Matter of Hubbell, 302 NY 246, supra; City Bank Farmers Trust Co. v Cannon, 291 NY 125, supra; Wendt v Fischer, 243 NY 439; Matter of People [Bond & Mtge. Guar. Co.], 303 NY 423; Matter of Ryan, 291 NY 376; Albright v Jefferson County Nat. Bank, 292 NY 31.)
Inasmuch as the court finds the agreements are invalid the contention by Marlborough that performance under the consignment contract is a matter for arbitration must be rejected. (See CPLR 7503, subd [a]). The court is not dealing with the construction of a simple contract but with the fundamental relationship between executors and the estate beneficiaries which makes voidable any transaction in which a divided loyalty has crept into the fiduciary relationship (Matter of Durston, 297 NY 64). The arbitration clause falls with the contract and is unenforceable. (Village of Tarrytown v Woodland Lake Estates, 19 NY2d 660; Durst v Abrash, 22 AD2d 39, affd 17 NY2d 445; 8 Weinstein-Korn-Miller, NY Civ Prac, pars 7501.24, 7501.25). Many parties to this litigation are not parties to the arbitration agreement. No move to seek arbitration or any other legal relief was initiated by any executor until all parties to these contracts were made respondents by beneficiaries in this litigation.
The fact that these agreements are voidable because of self-dealing does not revive the 1969 inter vivos agreements. The court finds from their conduct that the parties intended to abandon and abrogate those agreements. (Schwartzreich v Bauman-Basch, Inc. 231 NY 196; Green v Doniger, 300 NY 238; Matter of Schanzer, 7 AD2d 275, affd 8 NY2d 972). Such contracts are no longer enforceable.
The agreement to abandon or cancel the prior agreement need not be expressed but may be inferred from the attendant circumstances and conduct of the parties (Matter of Schanzer, supra).
In the instant case Marlborough respondents used the existence of the 1969 agreements and its contention that those agreements were enforceable after decedent’s death as a lever to extract from the fiduciaries the new agreements which were different and more beneficial to these respondents. They may not now be heard in their contention that the 1969 *859 agreements should be reinstated. Apart from abandonment, the resulting massive change in position detrimental to the estate estops the Marlborough respondents from resurrecting the abandoned and superseded 1969 inter vivos contracts.
The next issue to be determined concerns the liability of the remaining Marlborough respondents.
The Marlborough organization is a maze of 21 legal entities. Except for nonmajority participations in three galleries, the ultimate interests in the organization, as well as the three mentioned galleries which are not the respondents here, rest in a foreign inter vivos trust and a "stiftung”. The beneficiaries of these holdings are respondent Frank Lloyd (Francis K. Lloyd) and members of his family alone. At the time of the negotiations with the estate Frank Lloyd was the life beneficiary of these trusts with rights to revise their beneficial terms. The "stiftung” held all stock in 16 Marlborough companies including the respondents Marlborough Galleries, Inc. (MNY) and Marlborough A. G. (MAG). Lloyd authoritatively asserted at the trial that he alone dominated and controlled all Marlborough operations. All consequential decisions were made by Lloyd and all employees acted pursuant to his instructions. The finances of the various Lloyd-controlled companies were intermingled and paintings were invoiced to and from those companies as convenience served. This disregard of corporate entities and the interrelation of financial transactions is particularly apparent in the sale of 22 consigned paintings, purportedly to Allgemine Europaische Kunstansalt (AEK), on June 28, 1971. The conclusion must be that Lloyd is Marlborough. No distinction can be drawn for purposes of liability between the respondent MNY and respondent MAG since, for such purpose, any gossamer corporate veil can be pierced. The respondent Marlborough corporations will be referred to hereinafter sometimes as Marlborough and such corporations will be jointly and severally liable for the damages assessed.
Where an executor sells property to a third person and the sale is not in breach of a fiduciary duty, the purchaser holds the property free of any claims by the estate beneficiaries. If the executor transfers property in breach of his duty and the transferee has notice of the breach the interests of the beneficiaries are not cut off.
"Since the earliest times it has been a recognized principle of law that where any person deals with a fiduciary, knowing him to be such, he is particeps criminis in a devastavit *860 committed by the transaction.” (Matter of Gauthier, 143 Misc 788, 790; cf. People v Pleas, 2 Johns Cas 376; Palmer v Elco Realty Co. 8 NYS2d 908, 909). This basic rule was clearly stated as early as 1827 in Colt v Lasnier (9 Cow 320) where the court stated (p 342): "It seems to me, therefore, the correct rule, both in England and in this state, is, that any person receiving from an executor the assets of his testator, knowing that this disposition of them is a violation of his duty, is to be adjudged as conniving with the executor; and that such person is responsible for the property thus received”. (See, also, United States v Dunn, 268 US 121; Wetmore v Porter, 92 NY 76; Powell v Freeport Bank, 200 App Div 432; Bullis v Bruce, 274 App Div 532; Matter of Block, NYLJ April 2, 1975.)
It is clear that the Marlborough respondents were aware of and had knowledge of the fiduciaries’ deviation from their duty. They were certainly aware of the conflict of interest and as such are chargeable with notice that the executors were committing a breach of their duty in entering into the contracts (cf. 4 Scott, Trusts [3d ed], § 297.5) and were also aware of their breach of duty of loyalty and of reasonable care in failing to obtain merchandizing advice, or court approval, and failing to sell the assets for sufficient prices and on other reasonable terms. (Cf. Rippey v Denver United States Nat. Bank, 273 F Supp 718.) '
Marlboroughs are therefore subject to the right of the beneficiaries to reclaim the paintings not disposed of and to restoration of the value of those sold to bona fide purchasers or to any purchasers. (4 Scott, Trusts [3d ed], §§ 291.1-291.2.) The determination of such value is left for later discussion.
Lloyd was not personally joined as a party respondent until his violation of the temporary restraining order was alleged. His personal liability is also left for later discussion.
Before the contracts with the estate were executed, Marlborough undertook a comprehensive plan to promote Rothko paintings. The formulation of this plan was begun prior to the signing of the contracts in anticipation of the successful acquisition of estate paintings by Marlborough and the consignment of paintings for sale through Marlborough. This promotion consisted in the main of the arrangement of exhibitions of Rothko paintings throughout various countries and it must be recognized that such efforts enhanced the sales values of the paintings and accomplished sales at prices in excess of those obtainable in the artist’s lifetime. The experts who *861 testified at the trial were not in agreement upon the question as to whether or not the death of an artist, and the consequent limitation of his available works, would result in higher valuations, but it cannot be gainsaid that the promotional efforts of Marlborough had a major effect in publicizing Rothko works and in creating a market for his product at higher prices, far higher than date of death values.
In dealing with the problem of restitution to the estate, one must assess the value of the assets lost to the estate. No problem arises with respect to about 658 estate paintings executed and owned at his death by Rothko which are still admittedly in the hands of the Marlborough respondents because the decree herein will order their return to the estate fiduciaries. However, it is contended by the Marlborough respondents and the respondent Lloyd that 140 of these estate paintings were sold and delivered to third persons who are not parties to this proceeding. In assessing the restitutional value of the lost works it is important for the court to define the status of the deceased artist and the value of his work that is lost to the estate.
Among those who testified at the trial on these aspects of this controversy was Professor Meyer Schapiro whom the court regards as one of the foremost art historians in the field of modern art living today. If he has living peers this does not detract from his opinion. Since 1928 he has taught in the Graduate Department of Art History at Columbia University. He has served as a professor of art throughout the world. Since the early 1940’s he has been on the Advisory Board of the Museum of Modern Art in the City of New York. Included in his numerous scholastic publications are many articles dealing with modern art. Columbia University has at any one time only three university professorships, the ultimate rank of professorship in the entire university. Professor Schapiro was one of those. While Professor Schapiro did not claim to be able to predict with reasonable certainty the future of the commercial value of this artist’s work, he was positive that a person of Rothko’s prominence in this leading school of art, would remain culturally at the top level into the foreseeable future. He emphasized that Mark Rothko was pre-eminent in his abstract expressionist work from about 1950 until his death in 1970, and also thereafter through the period of trial in 1974.
Professor Schapiro likened Rothko in prominence to Jackson Pollock, Willem de Kooning and Franz Kline. He ex *862 pressed the opinion that "anyone who was engaged in writing a book about contemporary American art, would give considerable space to the work of Rothko as compared to other painters.” He emphasized Rothko’s significance by saying "Rothko and Pollock and de Kooning were not only the outstanding American painters but also in world painting” at that period when the executors were deliberating as to the disposition of his work. In Europe, those who were observing American art generally regarded Rothko as a "top painter”. He further stated "I have seen in the last few years, a number of publications in which Rothko is named as a leading modern artist, a very great artist, and is likened to the major figures of the nineteenth and twentieth century.”
Peter Selz, professor of art at the University of California, curator of art for the art museum of that university and former curator of the Department of Painting and Sculpture at the Museum of Modern Art in New York City, testified as a witness on behalf of the Marlborough respondents. A statement attributed to Professor Schapiro that "at the time of his death, Rothko was regarded by many artists and critics as an old master, a painter who had established himself firmly as one of the three or four outstanding American artists, and perhaps one of the half dozen greatest living artists anywhere in the world” was characterized by Professor Selz as constituting praise "no more extravagant” than a comment made by Professor Selz himself 13 years earlier.
Thomas M. Messer, Director of the Guggenheim Museum, a major museum in the City of New York, testified that among the leaders of abstract expressionism Rothko assumed a primary level of importance and, in his own way, Rothko is as important for the field faction of abstract expressionism as Jackson Pollock is for his spontaneous figurations.
Both Professor Selz and Robert Goldwater, art historian and critic, compared Rothko to Michelangelo and, in writing about Rothko, the professor stated that the artist’s paintings can be likened to annunciations.
Arnold Glimcher, head of the Pace Gallery, New York City, described Rothko as a master who is "inextricable from the history of art.”
Ernst Beyeler, an important art dealer operating throughout the world from his base in Switzerland, considered Rothko as "one of the best artists after 1950 even in the world.”
*863 Ben Heller, a New York City art dealer, gave his opinion that Rothko is equally as important or great as Pollock.
In sum, all of the experts who appeared at the trial were in agreement that Rothko was a great master.
These or other experts were available for the executors to consult for assistance in their task of exercising prudent business judgment while deliberating in respect to the value of these works and the merchandising methods for disposing of these estate assets. Several of these expert witnesses made it clear that fear of loss of cultural importance was not a factor requiring precipitate merchandising disposition, or even precipitate distribution in kind to the beneficiaries.
While the criterion of taste which thus exalts Rothko as an artist may not be universally accepted, the respondent parties here have not substantially shaken this extraordinary praise, and the enormous prices fetched for individual sales, through to October, 1974 when the art market was said to be soft and spotty, corroborate commercially what was proved aesthetically.
The court issued a temporary restraining order on June 26, 1972 (and later an injunction on September 26, 1972) restraining the executors and the Marlborough corporations and their respective representatives, agents, officers, directors, employees, subsidiaries and affiliates from "selling or otherwise disposing” of the paintings which were subject to the sale and consignment contracts.
Some 57 paintings were allegedly invoiced to purchasers prior to the restraint but were shipped at subsequent dates. It is contended by the petitioners that the sales of these paintings were fictitious, that the invoice dates were fictitious, or, if legitimate, the delivery of the paintings on or shortly after the June 26, 1972 temporary restraining order was a violation of the temporary restraining order in that such delivery constituted sale or disposition of the paintings within the meaning of the court’s order.
It is primarily for the court which issued an injunction to determine its meaning and whether the conduct complained of is a violation of it. (Matter of New York & Westchester Town Site Co., 145 App Div 630). There can be no punishment for conduct before an injunction against it is granted. Welt v Beachcomber, Inc., 166 Misc 29). The issue, therefore, is whether respondents were guilty of "selling or otherwise *864 disposing” of paintings following issuance of the temporary restraining order on June 26, 1972 and of the preliminary injunction on September 26, 1972 if they invoiced paintings for sale prior thereto and delivered same thereafter. The word "sale” implies the passage of absolute title (Black’s Law Dictionary [4th ed]). As stated in Wickham v Levine (47 Misc 2d 1, 5, affd 24 AD2d 1035): "A sale consists in the passing of title from the seller to the buyer for a price (Uniform Commercial Code, § 2-106, subd. [1]; Matter of Sears, Roebuck & Co. v. McGoldrick, 279 N.Y. 184, 187, supra; Matter of Pennsylvania Whiskey Distr. Corp. v. Bruckman, 256 App. Div. 781, 783; Hall v. French-American Wine Co., 149 App. Div. 609, 612; Masao Hirasuna v. McKenney, 245 F. 2d 98, 102; United States v. Balanovski, 236 F. 2d 298, 304-305; cf. former Personal Property Law, § 82, subd. 2)”.
The phrase "other disposition” implies the parting with, alienation or giving up property (Black’s Law Dictionary [4th ed]) and were intended to include conveyances other than sales such as gift, assignment, abandonment, barter, exchange or destruction of the paintings. Two other law dictionaries appear to give a broader definition to the concept of disposition. Ballentine’s Law Dictionary (3d ed) includes: "To alienate, sell or transfer”. Bouvier’s Law Dictionary (8th ed) includes within the meaning of "dispose” "a word of large extent”. The significance of transfer for permanent possession beyond the reach of the enjoining court is also within the meaning of "otherwise disposing”. Mere shipping for a traveling show would not necessarily consitute a violation of such a restraint. However, the shipment to alleged purchasers for their permanent possession or permanent control is found alone a violation of the orders of this court.
Independently the facts show violation of those restraining orders in that the paintings were sold and the question of when title passed with regard to the sales is therefore very important to the issue of whether a violation of the orders has taken place, apart from "otherwise disposing.”
Subdivision (2) of section 2-401 of the Uniform Commercial Code provides that: "Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods”. (See, also, Wickham v Levine, supra; former Personal Property Law, § 100; Matter of Gunther’s Sons v McGoldrick, 255 App Div 139, 142, affd 279 NY 148; *865 McConihe v New York and Erie R. R. Co., 20 NY 495, 497; Decker v Furniss, 14 NY 611, 617; Shultz & Co., v De Nood, 194 App Div 149, 151-152.) Under the Uniform Commercial Code the only time title to goods passes at the time and place of contracting in the absence of explicit agreement is if the goods are at the time of contracting already identified; no documents are to be delivered; and delivery is to be made without moving the goods (Uniform Commercial Code, § 2-401, subd [3]). It is undisputed in this case that the paintings were to be physically delivered following making of the invoices and that delivery required moving the paintings. No proof was submitted showing the existence of any explicit agreements between Marlborough and the third-party purchasers to the effect that title was intended to pass upon making the invoices. The fact that the consignment contract between MNY and the executors provided that title should not pass until invoiced to purchaser by MNY has no effect on and does not constitute any agreement between MNY and the actual purchasers relative to passage of title between those persons. The court is of the opinion that these sales took place upon delivery to the purchasers and in all instances which occurred after the date of the temporary restraining order of June 26, 1972 constituted violations thereof. The fact that the invoices might represent contracts of sale and that delivery was made pursuant thereto does not excuse a violation of the later court order. If the invoices had the effect of transferring title to the paintings to third-party purchasers then the later delivery might not have constituted a violation of the restraint (Matter of Duryea, 17 App Div 540; Matter of Lincoln Capital Corp. v Roth Inc., 143 Misc 683).
In Matter of Lincoln Capital Corp. v Roth, Inc. (supra) it appeared that prior to the making of an order restraining a third party from transferring property belonging to the debtor, the debtor had assigned the debt to another firm. The fact that the third party made payment of the debt after the order was. made did not constitute a violation of the order since the prior assignment of the debt divested the debtor of all legal title to the fund and vested title in the assignee.
In the instant case the wording of the consignment contract to the effect that title would pass when paintings were invoiced did not transfer title to a third person; the invoices, if it be assumed for purposes of this proceeding that they were communicated to the third persons prior to the restraint, *866 might give rise to choses in action on condition of payment of consideration; neither such payment for nor delivery of 57 of these paintings took place until after the restraint of June 26, 1972, and so title to them did not pass to the vendees until after the effective imposition of the restraint and in violation thereof by the Marlborough respondents and Lloyd.
In Matter of Black (138 App Div 562, 563) defendant was served with an order forbidding him "to transfer or make any disposition of any property belonging to him or in which he has any interest”. This order was served on him on November 17, 1908. Following service of the order defendant paid money to his wife in satisfaction of an indebtedness to her. In seeking to excuse his conduct in turning over money to his wife, defendant stated that prior to the order and in February or March, 1907 he made an assignment to his wife of (p 564) "Everything that I was to earn or came to me until her indebtedness was paid.” The Appellate Division, Second Department, held that the motion to punish defendant for contempt should be granted because at the time defendant paid the money to his wife legal title was in him and his wife had merely an equitable lien on it. The court stated (pp 564-565) that the alleged assignment "if made in good faith for a valuable consideration and not void as against public policy, operates as an executory contract to transfer such after-acquired property and creates an equitable lien thereon. (McCaffrey v. Woodin, [65 N.Y. 459] supra; Wisner v. Ocumpaugh, 71 N.Y. 113; Coats v. Donnell, 94 id. 168; Kribbs v. Alford, 120 id. 519; Cooper v. Douglass, 44 Barb. 409.) But the legal title remains in the assignor (Hovey v. Elliott, 118 N.Y. 124, 136), and at law that title is not transferred until either the equitable lien is enforced by judicial decree or some new act intervenes by which the assignor puts the assignee in possession thereof. (McCaffrey v. Woodin, supra, 463, 464.) But this 'new intervening act’ was one of the things which the judgment debtor was expressly forbidden to do, and his violation of the injunction order in this respect clearly constituted a civil contempt. (Code Civ. Proc. § 14.) When the legal title to property is in a judgment debtor, he has no right to violate a positive order of the court and turn it over in settlement of an equitable claim or lien, no matter how meritorious that claim may be, until appropriate proceedings have been taken to establish such claim.” See also Schieffelin v Hylan (191 App Div 324) where the court stated (p 326): "Even if instruments *867 are given merely to carry out a previous obligation, the issue of them, if prohibited, is a violation of such an injunction.” The 57 sales in this case took place by air and marine shipment after the restraining order had been issued and effective, and the fact that invoices may have already been issued prior to such orders is no excuse for the violations.
Major portions of the petitioners’ unnecessarily voluminous briefs (see Slater v Gallman, 38 NY2d 1) are devoted to charges that many sales invoiced by Marlborough were fictitious transactions with two objectives, namely, (1) to avoid the injunction, and, (2) to place paintings in the names of purported buyers who were friendly to Marlborough and would make such paintings available to Marlborough for covert resale at higher prices or for some indirect benefit, during or after this litigation. These transactions are described by the petitioners as "parking” or "squirreling” of the paintings in bad faith.
Hundreds of documents have been received in evidence either to substantiate these charges or to refute them. The petitioners’ accusations impute a conspiracy involving purchasers, shippers, warehousemen and insurers even to the extent of characterizing this far-reaching plot as another Watergate. The allegations include the concealment of documents and perjury at the trial. These sweeping accusations have not been ruled upon because they are unnecessary to this decision.
The cross-petitioning Attorney-General also seeks to reopen the record, more than a year after conclusion of the trial, to establish by newly discovered evidence from abroad, that such invoices did not exist before the restraint. But for purposes of this proceeding that issue is substantively immaterial because the Marlborough corporate respondents and Lloyd are responsible for the same damages for sale or disposition after the restraint even if the invoices were not fraudulently predated. In any event, it is the decision of this court that the motion to reopen was not timely since the evidence should have been discovered during the lengthy trial. (Mulligan v Wetchler, 39 AD2d 102.)
This ruling is made, denying the order to show cause dated November 7, 1975, brought on by the cross-petitioning Attorney-General, and making moot any need for respondents to refute the evidence preferred. All such evidence so preferred by the Attorney-General as an offer of documentary proof *868 only, constitutes immaterial evidence in view of the disposition of this issue favorably to the petitioners on other grounds.
Mindful of the mandate of the unanimous Appellate Division in affirming this preliminary injunction, that "[a]n early trial, however, is clearly indicated,” (Matter of Rothko, 40 AD2d 965, 966, supra) this court denies the motion to reopen the trial. Almost 15,000 pages of transcript, plus approximately 5,000 pages of pretrial depositions, succeeded by an aggregate of approximately 3,000 pages of "briefs” on behalf of parties represented by seven law firms, amount to' more than enough. While one of the testator’s children supports the Attorney-General’s application to reopen the trial, the other petitioning child of the testator opposes such action on the ground of unnecessary further delay and expense.
An application was previously made by the Attorney-General of the State of New York to punish for contempt the respondent galleries, one of the executors and Francis K. Lloyd, upon allegations that these corporations and persons have violated the injunction order. Determination of that motion was held in abeyance pending conclusion of the trial (Matter of Rothko, NYLJ April 29, 1974). The application to punish Marlboroughs for contempt is granted. There is no proof that respondent Reis personally took any action nor aided and abetted Marlborough or Lloyd with regard to the transactions in violation of the orders of this court and accordingly the motion to punish him for contempt is denied. Respondent Francis K. Lloyd appeared in the contempt proceeding and raised affirmative defenses that (1) the injunction order is without application to him since he is not a respondent in the revocation proceeding, and (2) that he was not served with a certified copy of the injunction order.
With regard to the first affirmative defense it is true that as a general rule, an injunction is binding only on a party to the action. However, as pointed out in the prior decision, agents or representatives of a party or persons acting in combination or collusion with them or for their benefit may also be bound by the injunction. (Regal Knitwear Co. v National Labor Relations Bd., 324 US 9; 7A Weinstein-Korn-Miller; NY Civ Prac, par 6301.25.)
As stated by Judge Learned Hand in Alemite Mfg. Corp. v Staff (42 F2d 832, 833): "Thus, the only occasion when a person not a party may be punished, is when he has helped to *869 bring about, not merely what the decree has forbidden, because it may have gone too far, but what it has power to forbid, an act of a party.” The fact that Lloyd was not a party to the main proceeding, in itself does not bar his punishment for contempt if he acted on behalf of respondent-^ ¿ríes or either of them in bringing about violation of the 1 function. The fact that Lloyd was not served with a certified <r ,:j of the order is no defense to his prosecution for contempt' if he had knowledge of the issuance of such order. (Cf. Daly, v Amberg, 126 NY 490; Puro v Puro, 39 AD2d 873; Jewish Hosp. of Brooklyn v Davis, 8 AD2d 786; McKendry v McKendry, 202 Misc 312, rev other grounds 280 App Div 440.)
Persons not parties who have knowledge of the injunction may be bound by the injunction providing they are in privity with a party, such as officers or agents * c servants of a party acting in collusion with the party. (28 NY Jur, Injunctions, § 172.) This is so even if the initial process and injunction order were improperly served on the named party (Daly v Amberg, supra). It is noted in the instant case that service of the temporary restraining order and preliminary injunction was made upon the parties by service upon their attorneys. CPLR 6313 (subd [a]) authorizes the granting of a temporary restraining order without notice. CPLR 6313 (subd [b]) provide§ that a temporary restraining order be served in the £3asrj3 manner as a summons unless the court orders otherwise. tjTnlike the ordinary ex parte proceeding for a temporary restraining order, however, the . parties herein, other than Lloyd, were served with notice of the application for both the temporary restraining order and. preliminary injunction and if the parties have had such notice and an opportunity to be heard "no reason appears why the order cannot be served in the manner of any other interm^TaSe order — ordinarily by serving it with a notice of entry' fy mail upyn the defendant’s attorney”. (14 Standard Cff Prac Service, FIvisory Comm;, Notes to CPLR 6313, <\p 93; see, also, 7A Weinstein-Korn-Miller, NY Civ Prac,/par 6313.06; 12 Carmody-Walt 2nd, FT Practice, § 78:78; r»f. Puro v Puro, supra.) The tekipoirr.ry restraining order and the preliminary injunction wero therefore properly served on the parties. It is noted that none of the parties, except Lloyd, has raised any objection as to proper servjce of the injunction order (CPLR 5104), but just as to timeliness of service. It is further noted that to the extent that the date of the temporary restraining order and shipment *870 of paintings are the same, those paintings are not included as violative of the restraint.
The pourt finds that Lloyd had actual knowledge of the issuance of the temporary restraining order as of the date of its issuance and that in any event such knowledge is imputed to him virtue of his acknowledgement that he controls the entire Marlborough complex. (Cf. Abell v New York, Lackawanna & Western Ry. Co., 18 Weekly Dig 554, affd 100 NY 634.)
The court further finds that Lloyd acted in collusion and in combination with the restrained Marlborough parties in bringing about the sales and disposition of many paintings in violation of the orders of this court. While it may be true that Lloyd is a nonresident of New York, the court is of the opinion that he has submitted himself to this court’s jurisdiction by virtue of his acts and directions to the respondent Marlboroughs in this jurisdiction. (See CPLR 302, subd [a]; SCPA 210, subd 2, par [aj.) His attorneys appeared for him personally when he was joined as a party in connection with allegations of contempt of this court’s orders. The application to hold Lloyd in contempt is therefore granted.
Injunctions are within the class of judgments enforceable by contempt proceedings (12 Carmody-Wait 2d, NY Practice./ § 78:111) and this applies for violation of a preliminary or temporary injunction (People ex rel. Cauffman v Van Buren, 136 NY 252; Schwinn & Co. v Wein, 3 Misc 2d 548). If actual loss has been incurred by reason of the contempt, a fine sufficient to indemnify the aggrieved parties must be imposed upon the offenders (Judiciary Law, § 773). The fact that the aggrieved parties possess. another remedy to recover such damages does not prevent the institution of a proceeding to punish for contempt (Riedel Glass Works v Kurtz & Co., 260 ) App Div 163, rearg den 260 App Div 859, affd 287 NY 636; (Matter of Goslin, 95 App Div 407 affd 180 NY 505). The (remedies are concurrent. (Porous Plaster Co. of Village of Sing Sing v Seabury, 43 Hun 611; Matter of Morris, 45 Hun 167). Section 773 of the Judiciary Law specifically recognizes this by virtue of its provision that payment and acceptance of a fine imposed as indemnity for a civil contempt constitutes a bar to an action by the aggrieved party to recover damages for the loss or injury. There can be no double recovery. The actual loss contemplated by the statute is the damages which necessarily result from the misconduct in the instant case. The *871 estate has lost ownership of 57 paintings as a direct result of the violations by respondents. The estate is entitled to recover the present value of the paintings sold in violation of the orders less the amounts already received for them, as damages for such loss. (Cf. Riedel Glass Works v Kurtz & Co., supra.) Costs, expenses and reasonable attorney’s fees in the contempt proceeding may not be awarded in this case. Section 773 of the Judiciary Law does not authorize the inclusion of costs and expenses in a case where an actual loss or injury has been produced (Nickolopulos v Janaff, 268 App Div 829; see, also, Riedel Glass Works v Kurtz & Co., supra.) Such items are only allowed where no actual loss has been sustained. (See Bennett Bros, v Floyd Bennett Farmers Market Corp., 16 AD2d 897.)
The order restraining the respondents from selling or otherwise disposing of paintings was issued on June 26, 1972. Some paintings were shipped on that date and subsequently shipments of paintings were made. The shipments to purchasers after June 26, 1972 were in violation of the restraint.
On July 1, 1972, 13 canvasses, purportedly sold to Count Marinotti, Mr. De Lima and a Mr. Kolin were shipped by Swiss Air to Zurich, Switzerland. On July 5, 1972, 25 papers were sent by air to a representative of Hallsborough Galleries, Ltd. On August 22, 1972, two canvasses were shipped to Robin Ward, Cannes, France. On December 15, 1972 there was a shipment of seven canvasses to Mr. De Lima and of four canvasses to Mr. Yoram Polany. On March 14, 1974, one paper was delivered to Galleria Bernini Stabilimento, a Lichtenstein corporation. On March 27, 1974 a shipment of two canvasses and three paintings was made to a representative of Hallsborough Galleries, Ltd.
In all, 28 canvasses having a present total value of $2,520,-000 and 29 papers with a present value of $812,000 were sold and disposed of in violation of the restraining order. The Marlborough respondents and Lloyd are therefore fined in the above amounts.
It is clear that this litigation was the occasion for a hasty sale of consigned paintings at inadequate prices. Lloyd testified that sales were induced by a need to provide money for the defense of this litigation. However, it is devastatingly plain that his improvident undervaluation by bulk sales is proved by his failure to sell any of the similar paintings by the same artist acquired during the last year of Rothko’s life except by careful individual sales. If liquidating was his need, *872 Lloyd by his own testimony had at the inception of this suit 20 or more important canvasses of Rothko bought from him while alive and not subject to this lawsuit. In selling estate. Rothkos in bulk at distress prices, while carefully marketing preestate Rothkos, Lloyd has undermined his credibility as to the need for and the reason for distress bulk sales at improvident prices. The court is constrained to find that the respondent-galleries, at the direction of Lloyd, wilfully disposed of estate paintings in bulk resulting in falsely low prices at the time of such sales.
The court must now turn to the question of the proper measure of damages to be awarded to the estate. The parties herein have taken different positions on the question of damages recoverable because of the breach of the fiduciaries’ duties and respondent Marlboroughs’ participation therein. It is contended by some that the estate beneficiaries are entitled to recover from respondents the present value of the paintings and by others that the value as of the date of the original contracts is the correct measure of damages. Where there is a breach of duty of fiduciaries of an estate or trust the main criterion in fixing damages is the rule that the beneficiaries are entitled to be put in the position which they would have occupied if no breach of duty had been committed. (3 Scott, Trusts [3d ed], § 205.)
It is clear that where a fiduciary breaches his duty to the beneficiaries any loss to the estate must fall upon his shoulders and any profit derived from the breach, or profit which would have accrued to the estate if there had been no breach, will inure to the benefit of the estate. (Matter of Tannenbaum, 30 Misc 2d 743; Restatement, Trusts 2d, § 205, p 458; 3 Scott, Trusts, [3d ed], § 205; 49 Harvard L Rev 541; Matter of Talbot, 114 Cal App 2d 309.) The beneficiaries, therefore, have various options or remedies available to them where there has been a breach of duty by an estate or trust fiduciary. The beneficiaries may have the option of not only charging the fiduciary with a loss or making him account for a gain but also of charging him with a gain which was not made but would have been made if the fiduciary had not violated his duty. (3 Scott, Trusts [3d ed], § 205.)
Furthermore, if the fiduciary in breach of his duty had transferred property, by sale or otherwise, to any third person, the beneficiary has a full right to follow such property into the hands of such person, unless that third person is a bona *873 fide purchaser, for a valuable consideration, without notice. (Oliver v Piatt, 3 How [44 US] 333; 3 Scott, Trusts [3d ed], §§ 208, 291). If the fiduciary has invested the property or its proceeds into any other property into which it can be distinctly traced, the beneficiary also has an election, either to follow the same into the new investment, or to hold the fiduciary personally liable for the breach. (Oliver v Piatt, supra.) All of these options or remedies are not always available to the beneficiaries but depend upon the facts of the particular case.
In the instant case the 798 paintings were sold and consigned to respondent galleries who had knowledge of the breaches of duty by the executors. One hundred and forty of these paintings were eventually sold to third persons and the remaining 658 remain unsold. The petitioners have requested that these unsold paintings, and any sold paintings which can be recovered, shall be returned to the estate. Respondents are liable to the estate for the value of the paintings sold to third parties and the remaining issue concerns the time at which the values should be fixed. In narrowing the issue further, the question is whether the recovery should be the actual value of the paintings at the time of the sales by Marlborough, or their present value including any appreciation in their value. The contention that the value of the paintings at the time of the making of the 1970 estate contracts should be the measure of damages is rejected by the court.
Treatise authority for the imposition of appreciation damages can be found in Scott on Trusts and Restatement of Trusts. In speaking of the liabilities of other fiduciaries, and in particular trustees, (SCPA 103, subd 21), professor Scott in his work on trusts (3d ed, vol 3, § 208.3) states that: "Where the trustee sells trust property which it is his duty to retain, the beneficiaries are not limited to a recovery of the value of the property at the time of sale; if the property has subsequently appreciated in value or if income would have been received thereon if the trustee had retained it, they are entitled to its present value together with such income, since they are entitled to be put in the same position in which they would have been if the trustee had not committed a breach of trust but had retained the property as it was his duty to do.” He further points out in that same section, however, that: "The beneficiaries are not entitled to the value of the property at the time of the decree if it was not the duty of the trustee *874 to retain the property in trust and the breach consisted merely in selling the property for too low a price. In such a case, although he is liable for the difference between its fair value and the price at which he sold it, he is not accountable for any subsequent rise in its value.” (See, also, Restatement, Trusts 2d, § 208.)
It is noted that the executors had the power of sale (EPTL 11-1.1, subd Ob], par [5], cl [B]) and were not requested to distribute in kind.
Section 306 of Scott refers to liability where there has been a breach of the duty of loyalty and the trustee sells property to himself individually and then resells to a third person. In such a situation he provides that beneficiaries have the option of charging the fiduciary with the value of the property at the time of sale with interest, or with the value of the property at the time of suit. (Restatement, Trusts 2d, § 206; see, also, 2 Scott, Trusts [3d ed], § 170.10.)
In Buffum v Barceloux Co. (289 US 227) a judgment debtor pledged his stock in a family corporation with that corporation in fraud of creditors. The stock was put up for sale, without notice to any of the creditors, although the corporation was aware of the judgment creditors’ claim, and was bid in by the corporation for the amount of its claim. The stock was thereafter sold to other members of the family for less than its value. The judgment debtor waited a period of time and became a voluntary bankrupt. The trustee in bankruptcy brought suit to recover from the corporation the value of the property pledged by the bankrupt with fraudulent intent. The District Court awarded a judgment for the highest value of the property up to the time of the decree. It appeared that the value of the stock had decreased at the time of the trial and that the defendant bought back the shares and wished to change its liability by returning the stock. The Supreme Court upheld the District Court’s determination of damages in a decision by Mr. Justice Cardozo in which he. applied the law of trusts and held that the buying back of the property does not affect liability except at the option of the beneficiary. He stated (p 237): "Any other rule * * * would enable the wrongdoer to take advantage of his own wrong; to let the transaction stand, if the investment showed a profit and by aid of a repurchase to charge the beneficiary with an intermediate decline.” (See, also, Matter of Walsh, 126 Misc 479 [where the property depreciated]; Oliver v Piatt, 3 How [44 US] 333, *875 supra). Thus, where the value of the property has decreased at the time of suit, the courts agree that the measure of damages is the value at the time of sale or suit at the option of the injured parties but the fiduciary is not permitted at his own option to repurchase the property and return it to the beneficiaries. Professor Scott in discussing liabilities of third persons in his work on trusts repeats the general rule that a transferee of trust property with notice of the breach, can be charged with the value of the property and goes on to point out, without citing any cases, that:
"The authorities are not altogether clear as to the time at which the value of the property should be fixed. It would seem, however, that the beneficiary can at his option charge him with the value of the property at the time he disposed of it with interest thereon, or with its value at the time of the decree with any income which he has received therefrom. It seems proper to charge him with the value at the time of the decree, since if it had not been for the breach of trust the property would still have been a part of the trust estate.
"If the transferee has not disposed of the property, we have seen that he can be compelled to restore the property to the trust. Can the beneficiary compel him to pay the value of the property even though he is ready and willing to restore it? The authorities are not clear on this point. It is believed that the answer should depend upon the character of the notice. It would seem that if the transferee actually knew that the transfer was in breach of trust, especially if he knew that the trustee intended to misappropriate the property or its proceeds, he should be chargeable with the value of the property at the time when he received it. He is in much the same position as a converter, except that he is chargeable in equity rather than at law. It would seem, therefore, that the transferee in such a case cannot relieve himself of further liability by restoring the property to the trust. The beneficiary can if he chooses charge him with the value of the property at the time of the decree with the income which he has received from the property in the meantime.” (4 Scott, Trusts [3d ed], § 291.2; Restatement, Trusts 2d, § 291.)
There are not many reported cases allowing recovery of "appreciation damages” to a beneficiary of a trust or estate (34 NYU L Rev 596). One California case takes the position "that the authors of the Restatement intended to limit the liability for lost profits to cases either where there was a *876 breach of duty of loyalty, or where there was a breach of the duty to retain or to acquire specific assets.” (Matter of Talbot, 141 Cal App 2d 309; 90 CJS, Trusts, § 299.)
In Hopkins v Loeber (332 111 App 140) three trustees exchanged securities out of the trust for certain "B” certificates held by Harvey Hotel Corporation. Loeber, one of the trustees, had a substantial interest in Harvey Corporation. He owned $40,000 in bonds of that corporation. Sometime after the exchange, the securities received by Harvey from the trust were then exchanged by Harvey with Loeber for the $40,000 of Harvey bonds held by Loeber. The other two trustees, Fox and Swayne, did not benefit from the sale in that case.
The court held that all three trustees were liable for a breach of trust, but applied a different measure of liability for Loeber than for Fox and Swayne. The court noted that the trust instrument gave the trustees the power of sale and that Fox and Swayne had not personally benefitted from their breach nor were they guilty of fraud and were therefore held liable for the loss, if any, in value of securities at the time of the breach. The court went on to hold Loeber, who had personally benefitted from the breach and had been guilty of fraud, for the value of the securities at the time of suit. (See, also, McKim v Hibbard, 142 Mass 422; McCord v Nabours, 101 Tex 494.)
The question of allowing "lost profits” or "appreciation damages” to beneficiaries of a trust or estate for a breach of fiduciary duty is a difficult one where the fiduciaries have a power of sale. If in the area of trusts and estates the sole purpose of damages is to make the beneficiary whole, it would seem that when a fiduciary is authorized to sell and he sells to himself or to another with whom he is closely associated, the actual injury to the beneficiary is the difference, if any, between the price paid and the price which could have been obtained on the market. On the other hand is the rule that the fiduciary may be directed to reconvey the property at the option of the beneficiary if it remains in his possession and it may be argued that "Appreciation damages represent the monetary equivalent of reconveyance”. (Appreciation Damages for Self-Purchase by Trustee with Power of Sale, 25 U Chi L Rev 389, 392.)
It appears from the cases and authorities that appreciation damages should be granted at least where the breach of fiduciary duty is accomplished in bad faith, or where the *877 fiduciary is guilty of fraud, disloyalty or self-dealing, or where the fiduciary was under a duty to retain assets. Such damages may also be awarded against other parties who knowingly participated in such a breach of fiduciary duty. (Hart v Ten Eyck, 2 Johns Ch 62, 116; Hopkins v Loeber, supra; McKim v Hibbard, supra; 3 Scott, Trusts [3d ed], §§ 206, 291.2; Restatement, Trusts 2d, § 206; 25 U Chi L Rev 389, 392; 34 NYLJ L Rev 596; 4 UCLA L Rev 314). While such damages might not be absolutely necessary for adequate protection of the beneficiary, the awarding of such consequential damages is justified as a deterrent to future conduct of this nature by fiduciaries. (Hart v Ten Eyck, supra; cf. Diamond v Oreamuno, 24 NY2d 494.)
In Hart v Ten Eyck (supra), decedent’s son brought a proceeding against the administrators of his father’s estate charging them with gross acts of waste and fraud resulting in dissipation of the estate. It was found that the administrators made application to the court to sell real estate, falsely alleging that the estate was insolvent. It further appears that the real property was sold to relatives, friends and acquaintances of the administrators and that they later acquired interests in the property. The administrators were found liable for breaches of trust and on the issue of damages Chancellor Kent recognized the general rule that where a trustee sells stock in violation of his trust, the cestui que trust is entitled to the value of the stock at the time of sale but stated (2 Johns Ch 62, 116, supra):
"Here has been a continued series of [sic] bad faith, and it is requisite to the character of public justice, and for example’s sake, that the injured party should be completely indemnified, and that the other should answer for all the consequential damages resulting from the fraud. This is a fundamental principle in sound jurisprudence. * * *
"In the application of these principles, we are authorized to say, that where the land in which the plaintiff has an equitable title, exists in the representatives of Van Rensselaer, it ought to be conveyed. But where the land has been sold, as in some cases, by Van Rensselaer alone, and in others, by the administrators, under the orders of the Court of Probates, they must answer for the value, not as it existed at the time of the sale, for that would not be an indemnity, and would be too great an indulgence to fraudulent breaches of trust, but for the value of the land as it existed at the commencement of *878 the suit, if not at the time of taking the account by the master. I have rather preferred the era of the filing of the bill, as sufficient to afford an indemnity, though I observe the Courts of law, even on contracts to replace stock, have directed the jury to assess damages, to the price of stock at the day of trial, if the market price of it had risen in the mean time. (Shepherd v. Johnson, 2 East. 211; McArthur v. Seaforth, 2 Taunton, 257.)”
In the somewhat analogous area of cases dealing with conversion of stock, early New York decisions, as acknowledged by Chancellor Kent in Hart, awarded damages based upon the highest value of the stock reached between the date of the conversion and the date of trial. (31 ALR3d 1286, 1325 and cases cited, n 12). This rule was changed and the measure of damages for the conversion of articles of fluctuating value, such as marketable securities, is the difference between the amount credited as the proceeds of the unauthorized sale and the highest market value within a reasonable time after notice of the conversion (Hartford Acc. & Ind. Corp. v Walston & Co. 22 NY2d 672; Mayer v Monzo, 221 NY 442; Gelb v Zimet Bros., 34 Misc 2d 401, affd 18 AD2d 967). This so-called "New York Rule” concerning conversion of stock is somewhat analagous to the situation where a fiduciary violates his duty to retain assets or is guilty of disloyalty or fraud. The notice provision to an estate or trust beneficiary, however, would not usually occur until an accounting because such beneficiaries do not take an active part in investment policy. The purpose of the reasonable time provision in the conversion rule is to give the person whose stock was converted "a reasonable time after notice of the conversion within which to determine whether he will purchase other stocks in the place thereof and that he may use as a basis for his claim of damages resulting from the conversion the highest prices which have prevailed during such reasonable period.” (Mayer v Monzo, supra, p 446.) Under the rule relative to conversion of stock full appreciation in value of the stock to the date of trial or decree is not recoverable for the reason that, unlike the facts at bar where estate beneficiaries and infants are involved, the investor is in a position after notice of the conversion to decide whether or not to go into the market and replace the stock. In those circumstances giving the highest value to the time of suit would be unduly harsh to the converter who would be unable to avoid liability for a stock’s later growth while the *879 injured party would be given a free ride on the market instead of minimizing damages. In any event a similar rule limiting recovery of appreciation damages would not be applicable to estate beneficiaries who are not investors and who are required to take no other action than to seek legal redress after notice of wrongful conduct by their fiduciaries. Moreover, where unique works of art are wrongfully sold, there is no market where they can be recovered.
The court is of the opinion that respondents Reis and Stamos are liable for present value of paintings sold. Respondent Levine, who is not in a dual position acting for his own interest, is liable only for actual value of paintings sold by Marlborough as of the date of sales. (Cf. New York Credit Men’s Adj. Bur. v Weiss, 278 App Div 501, affd 305 NY 1; Matter of Soss, 71 NYS 2d 23; Matter of Fensterer, 79 NYS2d 427.)
Respondents Marlborough are liable jointly and severally with respondents Reis and Stamos for present values and with Levine to the extent of his liability for values at the times of sales. (4 Scott, Trusts [3d ed], § 291.2.)
In some instances there were reacquisitions and resales or exchanges of paintings which had been sold by Marlborough and such resales are significant indicators of the true value of such paintings. Definitive proof is lacking to vitiate the initial individual sales by Marlborough to dealers and individuals.
Of the 100 paintings purchased by MAG under its contract with the executors, 71 allegedly have been sold. This litigation was instituted in November, 1971 and it appears that prior to this litigation Marlborough was obtaining legitimate retail prices on individual sales, but after the start of litigation a number of group or bulk sales were effectuated which have been alluded to hereinabove. It is found and held that all sales which may be classified as individual sales were made at fair prices. The bulk dispositions will be identified and discussed hereinafter.
Twenty paintings were invoiced to Count Marinotti under three invoices in early 1972 for $760,000. Concededly these sales were made at discounted prices and it is found that the amount recovered does not represent the then fair retail value of the paintings. The contrast between the prices obtained on these group sales and the prices paid by individuals is extreme. It is not contended that these paintings were of inferior quality nor can it be conceived that Marinotti would be *880 interested in the acquisition of inferior works. Professor Selz, the respondents’ expert, appraised these paintings as of May, 1970 at $877,000 while Mr. Heller, the petitioners’ expert, valued them at $1,080,000 as of May, 1970 and at $2,221,000 as of June, 1972 although his initial predeath appraisal was $775,000.
Considering the unchallenged sales to individuals as establishing a basis for valuations, it can be concluded that the average value of each painting sold to Marinotti was $65,000 and the total reasonable value of 20 canvasses was $1,300,000, with 6% interest on $325,000 from January 20, 1972, on $520,000 from February 2, 1972 and on $455,000 from February 16, 1972.
Eight paintings were invoiced to Arturos Peres de Lima on January 19, 1972 and February 24, 1972 for a price of $300,-000. These were group sales at discounted prices. There was testimony by Selz that some of these paintings were of inferior quality, three of average quality and one of superior quality. The Selz appraisal as of May, 1970 fixed the value of these paintings at $291,000; while Heller’s first predeath appraisal was $235,000, his May, 1970 appraisal was $340,000 and his appraisal as of June, 1972 was $660,000. In view of the question as to the general quality of these paintings they are valued at $400,000, with 6% interest on $250,000 from January 19, 1972 and on $150,000 from February 24, 1972.
Four paintings were disposed of to Yoram Polany on February 7, 1972 for $160,000. These paintings were of different sizes and of unequal quality but each was priced at $40,000. Heller’s first predeath appraisal of these paintings was $125,-000 and his May, 1970 appraisal was $190,000. Selz appraised these works as of May, 1970 at $157,000. Taking into consideration the increase in value which occurred following the artist’s death and the quality of the paintings, these paintings are valued at $200,000 and with 6% interest from February 7, 1972.
Three paintings were sold at $40,000 each to Robin Ward on April 15, 1972. Heller’s two appraisals of these paintings were at $95,000 predeath and $140,000 at May, 1970. The appraisal of Selz as of May, 1970 was $120,000 and the paintings were characterized by him as of average quality. Two of the paintings were restretched and restored. These paintings are valued at $150,000 with 6% interest from April 15, 1972.
The other sales from the lot of 100 paintings sold to MAG *881 appear to have been resold at reasonable prices. These sales by MAG of 36 paintings to individuals, as distinguished from group or bulk sales, total $2,474,500 and their value is fixed at this amount which is to be paid with 6% interest from the dates of these sales.
Whether 13 paintings acquired by Galleria Bernini Stabilimento (Bernini), AEK and Galerie Flinker (Flinker) were sold by MNY to MAG as a response to Reis’ request that funds be made promptly available to the estate, or whether such paintings were sold to Bernini, AEK and Flinker, the invalidity of the consignment contract renders any disposition of the paintings consequential only insofar as their valuations are concerned. It is also inconsequential whether two of these paintings were sold within a very short period to Mrs. Paul Mellon by Marlborough as a negotiator for Bernini or by Marlborough through an undisclosed arrangement between Marlborough and Bernini, since the ultimate fact is the liability of Marlborough to the estate for the value of the paintings. These two paintings were acquired by Mrs. Mellon for $420,-000 which is three times what MNY had reported them sold to Bernini two months before. The paintings were insured for $450,000. The value of the paintings is found to be $420,000 with interest from the date of the purported sale to Bernini.
Two of the 13 paintings purportedly sold to Bernini were reacquired by Marlborough through an exchange, and later were sold by Marlborough for $30,000 and $34,000 respectively. These paintings are valued at the latter sums with interest from the date of sale to Bernini.
Of the remainder of the 13 paintings, the one delivered to Bernini and the paper, sold to Flinker are valued at $16,000 each with interest from the sales dates. The value of the seven paintings acquired by AEK is fixed at $350,000 with interest from the time of sale.
Interest on the above sums, less any payment made to the estate, is to be computed at 6% from the sales dates.
The transaction of June 28, 1971 involving AEK, like many others, is involved and confused by purported mistakes and misunderstandings. On June 21, 1971 27 paintings, including 22 of the consigned paintings, were invoiced by MNY to Marlborough Rome on "sale or return” and, purportedly, Stutz-Pulver, a "financing office” of Marlborough Rome, sold the 22 consigned paintings to AEK on June 28, 1971. In August, 1972 AEK credited the bank account of MAG with an *882 amount in excess of the June 28, 1971 sales price. This required an adjustment within the complex Marlborough organization, but this adjustment also involved errors and subsequent bookkeeping corrections. Oddly, Stutz-Pulver paid MNY the amount of the June 21, 1971 invoice although AEK previously had paid MAG. This payment by Stutz-Pulver was in a smaller amount than the price obtained by MAG from AEK. All these bookkeeping transactions, whether accidental or contrived, established that the Marlborough organization was a complex conceived to serve the financial convenience of Lloyd. Marlborough acknowledges that the ultimate result of this circuitous disposition of the 22 paintings, consisting of canvasses and papers of mixed quality and condition, was the receipt of $332,000. Professor Selz appraised these paintings at $489,750 as of the date of sale and a figure of $490,000 is accepted as the valuation of these paintings with 6% interest from June 28, 1971.
Four paintings were reported by Marlborough as sold to Hallsborough Gallery, Ltd. (Hallsborough) on November 2, 1971 but obviously the report to the executors was incorrect. Two papers were exchanged for a Rothko canvas obtained by Marlborough in 1969 so that, as to these papers, a sale of consigned paintings was not effected but, instead, a sale by Marlborough of its own painting to Hallsborough. One of these reacquired papers was sold to Agnelli for $24,000 and the other to Forberg for $17,000, amounts which represented the true value of the papers. Canvas No. 5219.69 was in fact sold to Anderson for $76,500 and Paper No. 1179.68 was sold to Westcott for $32,000, which were appropriate prices. Paper No. 1177.68 was purportedly sold to Hallsborough for $18,000, a figure which appears to be a proper evaluation. Interest on these valuations is to be paid from the dates of sales.
Marlborough reported the sale of 25 papers to Hallsborough by invoice dated April 15, 1972 for a total of $211,000 with a net payment to the estate of $126,600. This bulk sale was consummated hurriedly and at sacrifice prices. There is an issue as to whether this was done by Marlborough to obtain ready cash for purposes of litigation or with an ulterior design. The contention that the paintings were disposed of to create a secondary market does not appear credible. The ultimate fact is that adequate prices were not obtained. Marl-boroughs’ expert appraised these 25 works at $331,350 as of the date of sale. Petitioners’ expert placed a predeath valúa *883 tion of $245,000 on these papers. Concededly the sale involved papers of small size which might not have been readily marketable. Taking this into consideration, the valuation of $331,350 is accepted with interest from the date of sale.
Four small papers purportedly were sold to Richard Wookey who was the landlord of the Marlborough Canadian gallery and a director on that gallery’s board. It is said that he served as a director without compensation. This sale is reported as made on February 23, 1972 for the total sum of $48,000 on the basis of $12,000 for each paper. Three of the papers were reacquired by Marlborough in exchange for a paintings which it had purchased from Rothko in 1969. These reacquired papers were later sold by Marlborough for $73,500, an amount which is determined to be their true value. As to the fourth paper, retained by Wookey, its sale price of $12,000 will be accepted as its value. The works involved in these transactions are valued at $85,500 with 6% interest from February 23, 1972.
MNY and MAG are directed to return the 658 unsold paintings to the estate. If Marlborough shall be able to recoup any painting of which it has disposed, and any petitioner desires the return of any such paintings, Marlborough may return such painting to the estate and its liability will be reduced accordingly. This alternative is suggested not only in a sense of equity but in consideration of the conflicting views of the parties as to the present marketability of the paintings. Marlborough contends, that the art market has become depressed, which would be a factor facilitating its recovery of paintings at lower prices than those which Marlborough endeavored to justify in this proceeding. On the other hand, if the values of Rothko paintings have increased, as contended by the petitioners, they should be pleased to receive the paintings in lieu of cash. Paintings returned to the estate must be in the condition in which Lloyd’s interests received them, or, if since then restored or otherwise improved, in the best condition.
The valuations found above aggregate $6,464,880 without interest. Of this, the respondents Marlboroughs have paid to the estate under the now voided contracts in excess of $1,500,-000. Levine’s liability is limited to this amount, plus interest.
The court will now determine the current valuation of the paintings. Ben Heller, called as an expert witness by the petitioners, made appraisals of the estate paintings as of four *884 dates, February, 1970 (predeath), May, 1970 (postdeath, precontract), January, 1972, and January, 1974. The predeath appraisal was increased by one third for canvasses and doubled for papers, in order to arrive at a postdeath, precontract valuation and this valuation again was increased by one third to arrive at January, 1972 values. An independent appraisal was made by Mr. Heller for valuations as of January, 1974. All these values were approximations of market retail values.
The 1974 figures are the only testimony available as to appreciation damages, except for the one dealer to dealer sale of October, 1974 of a single medium size canvas at a price of about $142,000. The intermediate appraisals as of May, 1970 and January, 1972 were based upon a mathematical formula applied by the petitioners’ expert. While it must be recognized that any appraisal of art is not a scientific evaluation, neither may it be regarded as subject to a strict mathematical formula. The petitioners insist that the 100 paintings purchased by Marlborough AG were the choice selection of the estate paintings. Mr. Heller evaluated these 100 paintings at $4,815,-000 as of February, 1970, at $6,420,000 at the time of the contract, at $8,560,000 as of January, 1972 and at $14,613,000 as of January, 1974. The appraisal as of January, 1974 reflected appreciations of individual paintings from three to five times their February, 1970 value. Assuming that the choice selections had such a substantial increase in value, it cannot be said that the greater number of lesser works experienced the same multiple increase.
There was considerable disagreement among the experts as to the effect of an artist’s death upon the value of his works but, if the Heller appraisals are accepted, the entire body of paintings more than tripled in value during the four years following Rothko’s death. That there was an appreciation in the market value of Rothko paintings subsequent to his death has been established through sales of paintings to individuals but the Marlborough organization must be credited with its contribution to this fact through its extensive promotional activities. In evaluating the paintings there also must be taken into consideration the condition of the paintings and the fact that due to careless storage by the decedent a number of paintings required repair and restoration.
The court regards the 1974 appraisal of Mr. Heller as too optimistic and cannot find as a fact that the sales prices suggested in this appraisal are realizable. The appraisals of *885 Professor Selz as of May, 1970 and as of sales dates are most substantially below those of Mr. Heller but, unfortunately, Professor Selz did not provide a statement of the values prevailing at the time of trial. It is the considered conclusion of the court that the average value to the estate of the Rothko canvasses which were disposed of by the respondents was $90,000 and the average value of papers was $28,000. These are valuations as of the time of trial and currently. While many sales were made at figures higher than this average, several canvasses ranging close to $200,000 each, and one for $250,000, considerations of fairness require many factors averaging to the $90,000 figure for canvasses and $28,000 for papers. Seventy-one of the 100 canvasses purchased by Marlborough A G were sold and 15 of the canvasses consigned to MNY were sold. Fifty-four of the consigned papers also were sold. Appreciation damages are awarded in favor of the estate for the 140 paintings resold to third parties in the amount of $9,252,000, against both Marlborough respondents, and the executors Reis and Stamos, jointly and severally.
The petitioners seek to assess attorney’s fees against the executors and Marlboroughs.
The executors Reis and Stamos by reason of their improper conduct, may be held liable for legal expenses occasioned by their conduct (Matter of Garvin, 256 NY 518; Matter of Bausch, 280 App Div 482, 494; Parker v Rogerson, 76 Misc 2d 705, 710). The legal expenses of petitioners to be chargeable against either or both of these executors or against the estate fund as it may be enhanced or against both are left for future determination. (Dawson, Lawyers and Involuntary Clients: Attorney Fees from Funds, 87 Harv L Rev 1597, 1627-1632.) The attorneys for all fiduciaries shall look to their clients for their compensation and may not charge their fees against the estate.
Marlboroughs’ position is not identical to that of the executors in that these respondents were not testamentary fiduciaries. Normally attorney’s fees are merely incidents of litigation and are not recoverable absent contractual obligation or specific statutory authority (City of Buffalo v Clement Co., 28 NY2d 241, 262).
It is a general rule that a party is not entitled to recover attorney’s fees from an opposing party even though the necessity of engaging in the litigation was caused by the wrongful act of the opposing party (Alyeska Pipeline Co. v Wilderness *886 Soc. 421 US 240). An exception to that rule is found where, as a proximate and natural consequence of a tortious act, a party is required to defend or to bring an action against a third party, he is entitled to recover reasonable attorney’s fees necessarily incurred (Fugazy Travel Bur. v Ernst & Ernst, 31 AD2d 924, see record on appeal); Shindler v Lamb, 25 Misc 2d 810, affd 10 AD2d 826, affd 9 NY2d 621; Restatement, Torts, § 914; 25 CJS, Damages, § 50, subd (e); Jones v Morgan, 90 NY 4; Hynes v Patterson, 95 NY 1). That exception is not applicable in the case at bar since no other litigation was caused by any act of the respondent galleries.
Another exception is found wherein the court may assess attorney’s fees for the willful disobedience of a court order as part of a fine to be levied. (Alyeska Pipeline Serv. Co. v Wilderness Soc., supra); Toledo Scale Co. v Computing Scale Co., 261 US 399, 426; Fleischmann Corp. v Maier Brewing Co., 386 US 714, 718.) In New York, however, under section 773 of the Judiciary Law as previously mentioned, attorney’s fees are not part of the fine where actual loss has occurred but only as part of the fine where no actual damage has resulted. This rule is apparently based upon the theory that a fine in such case is fixed upon proof of actual damages sustained according to the rules of law which would apply in an action for such damages (10 Carmody-Wait 2d, NY Practice § 66.41). In such a common-law action for damages the ordinary rule preventing recovery of attorney fees would be applicable.
No exception to the general rule is applicable to allow recovery of attorney’s fees against respondents Marlboroughs nor against Lloyd.
Nor does there seem to be an exception in New York or in Federal practice leading to the shift of counsel fees against the opposing parties for causing a litigation in bad faith, nor for acting as "private-attorney-general.” (Alyeska Pipeline Co. v Wilderness Soc., 421 US 240, 263, supra.)
The decree to be made in this proceeding may reserve to the petitioners Kate Rothko and Christopher Rothko the opportunity to apply by supplemental petitions for reasonable attorneys’ fees.
The liabilities of the various parties to the estate are as follows:
Respondents Marlboroughs and Frank K. Lloyd are fined in the amount of $3,332,000 for their contempt in violating the orders of this court. Their liability is joint and several.
*887 Insofar as the estate is concerned payment of appreciation damages or return of any of the 57 paintings will satisfy or reduce the fine levied for contempt and bar recovery of the fine or a portion thereof as the case may be. A fine having been levied for loss caused to the estate by reason of the disposition of the 57 paintings in violation of the injunctions, there can be.no double recovery. Payment of the fine levied or return of the paintings will also be credited against the liability for damages.
Respondents Marlboroughs are directed to return the 658 unsold paintings to the estate.
Respondent Levine is liable for damages in the amount of $6,464,880 plus interest as provided herein, less amounts previously paid to the estate with regard to the sales of the paintings.
Respondents Reis, Stamos, MNY and MAG, apart from being jointly and severally liable for the same damages as Levine for negligence, are liable for the greater sum of $9,252,000 as appreciation damages less amounts previously paid to the estate with regard to sales of paintings. Payment of this sum will satisfy all liabilities to the estate.
. All amounts owing to the estate are subject to reduction, not only for moneys previously paid to the estate, but also for any painting of the 140 disposed of by respondents which they succeed in recovering and returning to the estate, pursuant to exercise of petitioners’ option.